STATE of Wisconsin, Plaintiff-Respondent,

v.

Ibrahim BEGICEVIC, Defendant-Appellant.

Court of Appeals

*No. 03–1223–CR. Submitted on briefs September 23, 2003.—
Decided February 4, 2004.*

2004 WI App 57

(Also reported in 678 N.W.2d 293.)

675

676

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Donna J. Kuchler* of *Kuchler Law Offices*, Waukesha.

On behalf of the plaintiff-respondent, the cause was submitted on the briefs of *Jennifer R. Dorow*, assistant district attorney, Waukesha, *James M. Freimuth*, assistant attorney general, and *Peggy A. Lautenschlager*, attorney general.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. ANDERSON, P.J.[1] Ibrahim Begicevic raises multiple challenges to his conviction for a second offense operating with a prohibited alcohol concentration

---

[1] All references to the Wisconsin Statutes are to the

678

(PAC). We agree with the trial court that the arresting officer had reasonable suspicion to conduct a traffic stop and probable cause to request Begicevic to submit to a preliminary breath test (PBT). However, we reverse and remand this case because the arresting officer failed to use reasonable means to convey the implied consent warnings to Begicevic. On remand, Begicevic can pursue an order stripping the breath test results of automatic admissibility because suppression of the test results is not available when an arresting officer fails to use reasonable methods to meet the terms of the implied consent law.

¶ 2 Following the filing of a criminal complaint charging Begicevic with operating while intoxicated (OWI), second offense, and PAC, second offense, he filed motions seeking to suppress all blood alcohol test results, all oral and written statements and all other evidence. In his motions, Begicevic asserted that the arresting officer lacked reasonable suspicion to conduct a traffic stop, lacked probable cause to ask him to submit to a PBT, and failed to reasonably inform him of the implied consent warnings. After an evidentiary hearing and the filing of written argument, the circuit court denied all of Begicevic's motions. He raises the same issues in this appeal from his conviction for PAC, second offense.

2001–02 version unless otherwise noted. Although this case was originally a one-judge appeal, we ordered that this case be made a three-judge appeal pursuant to Wis. Stat. Rule 809.41(3). The attorney general elected to participate and filed a supplemental brief.

¶ 3. Begicevic contends that the arresting officer lacked reasonable suspicion to support an investigative stop and seeks suppression of all evidence. "When we review a motion to suppress evidence, we will uphold the circuit court's findings of fact unless they are clearly erroneous. However, the application of constitutional principles to the facts is a question of law we decide without deference to the circuit court's decision." *State v. Fields*, 2000 WI App 218, ¶ 9, 239 Wis. 2d 38, 619 N.W.2d 79 (citations omitted). A law enforcement officer may lawfully conduct an investigatory stop if, based upon the officer's experience, he or she reasonably suspects "that criminal activity may be afoot." *State v. Williams*, 2001 WI 21, ¶ 21, 241 Wis. 2d 631, 623 N.W.2d 106 (*citing Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion is dependent on whether the officer's suspicion was grounded in specific, articulable facts, and reasonable inferences from those facts, that an individual was committing a crime. *State v. Waldner*, 206 Wis. 2d 51, 55–56, 556 N.W.2d 681 (1996).[2]

¶ 4. Officer Renee Kennedy of the City of Brookfield Police Department was assisting another officer during an early morning traffic stop when she saw a vehicle approximately four hundred feet south of her

---

[2] When reviewing a suppression ruling, we are not limited to the record before the circuit court at the time of the suppression ruling. Other information produced before or after the suppression hearing may be used to support the circuit court's decision. *State v. Gaines*, 197 Wis. 2d 102, 106–07 n.1, 539 N.W.2d 723 (Ct. App. 1995). In this case, we have the benefit of the complete transcripts of the motion hearing and the jury trial and we develop the relevant facts from both the motion hearing and the trial.

location. What attracted her attention to the vehicle was that it was stopped, on an angle, in the left-turn lane but in the middle of the intersection beyond the stop line painted on the roadway. Kennedy made the decision to investigate why the vehicle was in the middle of the intersection and drove past the scene, made a U-turn, activated her emergency lights and came up behind the vehicle. As she pulled up behind the vehicle, the green left-turn arrow was activated by her squad because the suspicious vehicle was too far ahead of the stop line to activate the turn signal. Begicevic, who was driving the vehicle, made a left turn as soon as the green left-turn signal was activated and stopped after the turn in response to the officer's emergency siren. Kennedy estimated that eight to ten minutes elapsed from the time that she first saw Begicevic stopped in the middle of the intersection to the time that she made contact with him.

¶ 5. Begicevic contends that from these facts there is no reasonable basis to believe that he had committed any traffic offense. A police officer can make an investigative traffic stop if he or she reasonably suspects that a person is violating or is about to violate the civil traffic regulations. *State v. Colstad*, 2003 WI App 25, ¶ 11, 260 Wis. 2d 406 659 N.W.2d 394, *cert. denied, Colstad v. Wisconsin*, 124 S. Ct. 281 (U.S. Wis. Oct. 6, 2003) (No. 03–110). "[W]hen a police officer observes lawful but suspicious conduct, if a reasonable inference of unlawful conduct can be objectively discerned, notwithstanding the existence of other innocent inferences that could be drawn, police officers have the right to temporarily detain the individual for the purpose of inquiry." *Waldner*, 206 Wis. 2d at 60 (citations omitted).

■

¶ 6. Kennedy had reasonable suspicion to conduct an investigative stop. Viewed in isolation, some of what she observed was lawful behavior. It is lawful for a car to be on the roadway at 1:30 a.m. It is lawful for a car to be stopped at an angle within its lane of travel. On the other hand, it is unlawful for a car to stop beyond a clearly painted stop line.[3]

¶ 7. Kennedy was entirely reasonable in briefly stopping Begicevic in order to preserve the status quo until she could get more information. *See Waldner*, 206 Wis. 2d at 61. It was proper for Kennedy to investigate to determine if she could confirm her observations, from four hundred feet away, that Begicevic stopped beyond the painted stop line. She was confronted with one set of inferences that there was a lawful explanation for Begicevic's driving and another set of inferences that his driving might also arise from unlawful behavior. It was the essence of good police work for her to freeze the situation until she could sort out the ambiguity. *See id.* We agree with the circuit court that there was reasonable suspicion to support Kennedy's traffic stop of Begicevic.

---

[3] WISCONSIN STAT. § 346.37(1)(c)1 provides:

> Vehicular traffic facing a red signal shall stop before entering the crosswalk on the near side of an intersection, or if none, then before entering the intersection or at such other point as may be indicated by a clearly visible sign or marking and shall remain standing until green or other signal permitting movement is shown.

¶ 8. Begicevic argues that Kennedy did not have probable cause to request that he submit to a PBT. WISCONSIN STAT. § 343.303 provides:

> If a law enforcement officer has *probable cause to believe* that the person is violating or has violated s. 346.63(1) or (2m) . . . the officer, prior to an arrest, may request the person to provide a sample of his or her breath for a preliminary breath screening test using a device approved by the department for this purpose. (Emphasis added.)

We review probable cause under a de novo standard of review. *County of Jefferson v. Renz*, 231 Wis. 2d 293, 316, 603 N.W.2d 541 (1999). The test of probable cause is greater than the reasonable suspicion necessary to justify an investigative stop but less than the level of proof required to establish probable cause for arrest. *Id.* at 314.

¶ 9. When Kennedy initially made contact with Begicevic, he appeared confused on how to get to Milwaukee. She immediately noticed a strong odor of intoxicants and that his eyes were bloodshot and glassy. She asked Begicevic to get out of his car so that she could administer several field sobriety tests. Although he had a heavy accent and asked her if she spoke German, she believed that she was able to communicate her requests to him in English and began to instruct him on the field sobriety tests she wanted to conduct. Kennedy explained and demonstrated the one-legged stand test but when Begicevic responded that he had a leg injury, she went on to the heel-to-toe test. As she started to explain and demonstrate the test, Begicevic began to perform the test; Kennedy told him to stop and

as she started to explain the test again, he began to perform the test again. When Kennedy started the third explanation of the heel-to-toe test, Begicevic again began to perform the test and Kennedy decided to let him complete the test. Kennedy concluded that Begicevic failed to properly perform the heel-to-toe test. She was unable to perform the horizontal gaze nystagmus test for the reasons that Begicevic either moved his head or kept his eyes straight ahead rather than follow the pen. Because Kennedy was giving Begicevic the benefit of the doubt, she had him perform a fourth field sobriety test, the finger-to-nose test. After she explained and demonstrated the test, Begicevic tried it unsuccessfully three times. Based upon all of her observations, Kennedy asked Begicevic to submit to a PBT.

¶ 10. This case presents the very kind of situation for which the PBT was intended because it aided Kennedy in determining whether probable cause to arrest existed. The PBT's place in the process of an OWI investigation was discussed by the supreme court in *Renz*, 231 Wis. 2d at 310–11. First, an officer may make an investigative stop pursuant to WIS. STAT. § 968.24 if the officer "reasonably suspects" that a person has committed or is about to commit a crime or reasonably suspects that a person is violating the civil traffic regulations. *Renz*, 231 Wis. 2d at 310. After stopping the vehicle and contacting the driver, the officer's observations may cause the officer to suspect the driver of operating the vehicle while intoxicated. *Id.* If the observations of the driver are not sufficient to establish probable cause for arrest for an OWI violation, the officer may request the driver to perform various field sobriety tests. *Id.* However, the driver's performance on

these tests may not produce enough evidence to establish probable cause for arrest.

> The legislature has authorized the use of the PBT to assist an officer in such circumstances . . . . For noncommercial drivers, the officer may request a PBT if there is "probable cause to believe" that the person has been violating the OWI laws. If the driver consents to the PBT, the result can assist the officer in determining whether there is probable cause for the arrest.

*Id.* at 310–11 (citations omitted). If, under the facts, there are reasonable grounds to believe that the person has violated the OWI laws, the officer may arrest the driver under WIS. STAT. §§ 345.22 or 968.07(1)(d). *Renz*, 231 Wis. 2d at 311. Kennedy's use of the PBT in this case is supported by probable cause and is consistent with its intended purposes.

IMPLIED CONSENT WARNINGS

¶ 11. Begicevic is Bosnian. He has lived in Wisconsin for six to eight years, his primary language is Croatian, and he speaks some German and some English. Given these circumstances, he contends that Kennedy's reading in English the Informing the Accused form was unreasonable. Whether the officer used reasonable means to convey the necessary implied consent warnings, WIS. STAT. § 343.305(4), is a question of law that we review de novo. *State v. Baratka*, 2002 WI App 288, ¶ 7, 258 Wis. 2d 342, 654 N.W.2d 875, *review denied,* 2003 WI 16, 259 Wis. 2d 104, 657 N.W.2d 708 (No. 02–0770) (application of the implied consent statute to an undisputed set of facts is a question of law that we review independently). "To the extent the circuit court's decision involves findings of evidentiary or his-

torical facts, those findings will not be overturned unless they are clearly erroneous." *Id.*

¶ 12. In *State v. Piddington*, 2001 WI 24, 241 Wis. 2d 754, 623 N.W.2d 528, the Wisconsin Supreme Court was confronted with the issue of how must an arresting officer convey the implied consent warnings to an apprehended individual for whom English is not his or her primary language. *Id.*, ¶ 18. Piddington had been profoundly deaf since birth and contended that he "needed an American Sign Language interpreter to fully understand the field sobriety tests and the information that he was to be given pursuant to Wisconsin's implied consent law." *Id.*, ¶ 1 (citation omitted).

¶ 13. Piddington was stopped by a Wisconsin State Patrol trooper on suspicion of drunk driving. *Id.*, ¶ 2. Piddington and his passenger informed the trooper that Piddington was deaf. Piddington also asked for a sign language interpreter. *Id.*, ¶¶ 2–3. While checking Piddington's driver's license, the trooper asked his dispatch to track down a law enforcement officer who knew sign language but was informed that none was available. *Id.*, ¶ 3. Although the trooper was planning to use the passenger to communicate with Piddington, he found that he could communicate with Piddington through notes, gestures and some speaking because Piddington could speech-read. *Id.*, ¶ 3 n.4. Ultimately, the trooper arrested Piddington on a charge of drunk driving. Before placing him in the squad car, the trooper handcuffed Piddington with his hands in front so he could communicate through notes. *Id.*, ¶ 5.

¶ 14. On the way into Madison, Piddington wrote a note requesting a blood test and the officer drove to a hospital to accommodate this demand. *Id.* A city of Madison police officer who had some knowledge of sign language, but was not a certified ASL interpreter, had

been located and met the trooper and Piddington at the hospital. *Id.*, ¶¶ 5–6. At the hospital, the police officer and Piddington were able to communicate by sign and orally. *Id.*, ¶ 6. Piddington was given the Informing the Accused form, told to read the form and to initial each paragraph if he understood it, which he did. *Id.* The trooper then attempted to read the form to Piddington, who had become uncooperative and indicated that he could not read the trooper's lips. *Id.*, ¶ 6 n.6. As a result, the police officer read the form to Piddington without any objection. *Id.* At the request of the police officer, Piddington submitted to a blood test. *Id.* The trooper testified that although at times it was difficult to communicate with Piddington, he made sure that Piddington understood what the trooper was saying and did not proceed with any step in the process until Piddington indicated that he understood. *Id.*, ¶ 9.

¶ 15. The supreme court stated that the question presented was "how to best ensure that law enforcement officers comply with the legislature's mandate requiring that apprehended drivers are informed about their rights and responsibilities under the implied consent law." *Id.*, ¶ 18. The supreme court concluded:

> [W]e conclude that whether law enforcement officers have complied with Wis. Stat. § 343.305(4) turns on whether they have used reasonable methods which would reasonably convey the warnings and rights in § 343.305(4) . . . . [T]he State has the burden of proof of showing, by a preponderance of the evidence, that the methods used would reasonably convey the implied consent warnings. Also, in the implied consent setting . . . the onus is upon the law enforcement officer to reasonably convey the implied consent warnings.
>
> Whether the implied consent warnings given sufficiently comply with Wis. Stat. § 343.305(4) depends

687

upon the circumstances at the time of the arrest; correspondingly, whether the methods used were reasonable and would reasonably convey those warnings also depends upon the circumstances facing the arresting officer. The purpose of Wis. Stat. § 343.305(4) to inform an accused driver, is fulfilled, rather than undermined, if the law enforcement officer must use reasonable methods that reasonably convey the implied consent warnings, in consideration of circumstances facing him or her. This interpretation ensures that an accused driver is properly advised under the implied consent law, without raising the specter of subjective confusion. Accordingly, we find that the legislature intended that law enforcement officers inform accused drivers of the implied consent warnings, and that duty is met by using those methods which are reasonable and reasonably convey those warnings under the circumstances at the time of the arrest.

*Piddington*, 241 Wis. 2d 754, ¶ 22–23 (footnotes and citations omitted).

¶ 16. In reaching this conclusion, the supreme court emphasized that the answer to the question depends only upon the conduct of the officer. *Piddington*, 241 Wis. 2d 754, ¶ 1.

Whether [the apprehended driver] subjectively understood the warnings is irrelevant. Rather, whether there was compliance with [Wis. Stat.] § 343.305 remains focused upon the objective conduct of the law enforcement officer or officers involved.

*Piddington*, 241 Wis. 2d 754, ¶ 32 n.19.

¶ 17. This case is easily distinguishable from *Piddington*. Kennedy immediately knew that English was not Begicevic's primary language—not only did he have a heavy accent, but he asked Kennedy if she spoke German. She testified that:

I noticed that he had a strong accent right away, and he did ask me if I spoke German; however, in communication, I believed I was able to get my point across either right away or speaking to him several times in explaining what I meant. He was able to communicate with me.

¶ 18. Facing this communication difficulty, Kennedy did not make any effort to request her dispatcher to find an interpreter who spoke German; in fact, she was not aware if her department had arrangements with any interpreter services. When Kennedy brought Begicevic to the police department, she was met by Elm Grove Police Officer Brian E. Gasse who had monitored Kennedy's calls to her dispatch and volunteered to help because he had five years of schooling in German. Gasse testified that Begicevic spoke broken German and in communicating back and forth, "hand motions were used too. [Begicevic] insinuated the type of words, and mostly it was his native tongue. [Bosnian]" At the station Kennedy did not make any effort to locate a fluent German interpreter to replace Gasse or a Bosnian interpreter.

¶ 19. While Kennedy was completing her paperwork, Gasse explained, as best he could, why the citation was issued and the amount of the forfeiture. Begicevic replied, in English, that the citation for the improper stop was not fair. Kennedy then read the Informing the Accused form to Begicevic, but Gasse did not provide a verbatim translation nor did he explain the rights on the form in German to Begicevic. However, when Kennedy asked Begicevic to provide a sample of his breath for testing, Gasse was able to ask Begicevic, in German, if he would submit to the test. "After I worded the question one or two ways and in

English and made hand motions, he eventually stepped up to the intoxometer and complied."

¶ 20. Whether Begicevic understood Kennedy sufficiently to complete several field sobriety tests or understood Kennedy and Gasse sufficiently to submit to a test of his breath is not relevant. The lesson of *Piddington* is that we are not to apply a subjective test or assess the driver's perception of the information delivered. *Id.*, ¶ 21. The question is whether, under the circumstances confronting Kennedy, she used reasonable methods to reasonably convey the implied consent warnings to Begicevic. And we have to answer no.

¶ 21. Kennedy did not attempt to obtain an interpreter. When Kennedy read the Informing the Accused in English, Gasse did not translate the form verbatim nor did he make an effort to explain the rights in the form in German to Begicevic. In *Piddington*, the trooper used speech-read, gestures and notes to communicate with Piddington. Additionally, he was assisted by a police officer who knew ASL and Piddington was given the opportunity to read the implied consent warnings and initial that he understood each paragraph. Kennedy's attempts to reasonably communicate with Begicevic fall woefully short of the standard set by the trooper in *Piddington*.[4]

---

[4] We are mindful that the State only has a small window of opportunity in which to collect a valid breath-alcohol sample, *see State v. Bohling*, 173 Wis. 2d 529, 533, 494 N.W.2d 399 (1993); *see also* WIS. STAT. § 885.235(1g) (blood test result is automatically admissible if blood is taken within three hours of the stop); nevertheless, that does not excuse the failure to make an effort to use reasonable methods to convey the implied consent warnings to Begicevic. There is nothing in the record to support a conclusion that it would have taken extraordinary or impractical measures to reasonably convey the implied consent

¶ 22. While conceding that "officers probably must make some reasonable effort to accommodate" a driver who does not understand English, the State contends that Kennedy "reasonably conveyed the implied consent warnings to Begicevic with due regard for [his] apparent limitations in understanding English." The State points out (1) by the time she read the implied consent warnings, Kennedy had reason to believe that Begicevic had an understanding of English; (2) Gasse was able to converse with Begicevic in German; (3) Begicevic had been previously arrested for OWI; (4) Begicevic understood Gasse's request for him to take a breath test; and (5) Begicevic had lived in the area, had a job and possessed a Wisconsin operator's license.[5] The State argues that this information, pitted against the exigency of blood-alcohol dissipation, supports the conclusion that the officer reasonably conveyed the implied consent warnings to Begicevic and reasonably did not try to locate an interpreter.

warnings to Begicevic. The traffic stop occurred at 1:20 a.m. Kennedy transported Begicevic to the police station, began to process the necessary paperwork, read him the Informing the Accused form and, at 2:08 a.m., requested that he submit to a chemical test. Begicevic's first breath sample was recorded at 2:20 a.m. and the second sample at 2:26 a.m. Within the three hour window of opportunity, § 885.235, there was a cushion of almost two hours in which a reasonable effort could have been made to find an interpreter.

[5] It is unreasonable to assume that a driver possessing an operator's license understands the English language. The rules for knowledge tests of applicants for an operator's license includes a note providing, "Persons who do not speak English are encouraged to advise the Department of the languages they can read and speak when scheduling their examinations. The Department will attempt to accommodate special language needs of applicants." WIS. ADMIN. CODE § Trans 104.03.

691

¶ 23. We will address the State's arguments in reverse order. We are not persuaded that the exigency of blood alcohol dissipation excuses the officer's failure to attempt to locate an interpreter. The breath test was administered within one hour of Begicevic's arrest; the officer still had two hours in which an effort could have been made to locate an interpreter. *See State v. Bohling*, 173 Wis. 2d 529, 533, 494 N.W.2d 399 (1993); *see also* WIS. STAT. § 885.235(1g) (blood test result is automatically admissible if blood is taken within three hours of the stop). Under the circumstances, there was not an immediate concern that the evidentiary value of a breath test would be compromised by waiting up to two hours while an effort was made to contact an interpreter.

¶ 24. The bulk of the State's argument addresses whether Kennedy could reasonably believe that Begicevic had a sufficient understanding of English to comprehend the implied consent warnings. The argument ignores *Piddington*'s admonition, "[w]hether [the apprehended driver] understood the warnings is irrelevant." *Piddington*, 241 Wis. 2d 754, ¶ 32 n.19.

¶ 25. Justice Sykes writes in a concurring opinion in *Piddington* that it would be unreasonable for an officer to merely read the implied consent warnings in English to a suspect who speaks a foreign language. *Id.*, ¶ 64. "The notion that the statute requires only an oral English language reading of the implied consent warnings to a . . . non-English speaking suspect is manifestly unreasonable." *Id.*, ¶ 65. We conclude that Kennedy's attempt to inform Begicevic of the implied consent warnings was manifestly unreasonable.

¶ 26. Begicevic seeks suppression of the breath alcohol test results as a result of the officer's failure to reasonably convey the implied consent warnings to him. "Suppression of evidence is 'only required when evidence has been obtained in violation of a defendant's constitutional rights, or if a statute specifically provides for the suppression remedy.' " *State v. Keith*, 2003 WI App 47, ¶ 8, 260 Wis. 2d 592, 659 N.W.2d 403, *review denied*, 2003 WI 32, 260 Wis. 2d 753, 661 N.W.2d 101 (No. 02–0583–CR) (citation omitted). *Piddington* clarifies that Begicevic is not entitled to the remedy he seeks. *Piddington*, 241 Wis. 2d 754, ¶ 34.

¶ 27. Neither alternative mentioned in *Keith*, 260 Wis. 2d 592, ¶ 8, is available to Begicevic. First:

> The breath test evidence was legally obtained incident to [Begicevic's] arrest because the arresting officer had two independent bases for obtaining the breath sample: (1) probable cause to believe the OWI statute had been violated and exigent circumstances (blood rapidly metabolizes alcohol, leading to the eventual disappearance of the evidence of intoxication), and (2) . . . [Begicevic's] actual consent to the testing.

*County of Eau Claire v. Resler*, 151 Wis. 2d 645, 653, 446 N.W.2d 72 (Ct. App. 1989). Second, the implied consent statute conspicuously lacks any legislative direction that test results must be suppressed when there is a failure to reasonably convey the implied consent warnings to an apprehended driver. *State v. Zielke*, 137 Wis. 2d 39, 51, 403 N.W.2d 427 (1987).

¶ 28. Under the circumstances of this case, apart from suppression, on remand Begicevic can pursue "an order prohibiting the automatic admissibility of the blood test result pursuant to [WIS. STAT.] § 885.235.

Instead of relying upon the automatic admissibility of the blood test, the State would have to establish the admissibility of the blood test, including establishing a foundation." *Piddington*, 241 Wis. 2d 754, ¶ 34.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.