# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP1593-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |       Plaintiff-Respondent, |
| |    v. |
| | Michael R. Tullberg, |
| |       Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 349 Wis. 2d 526, 835 N.W.2d 291)
(Ct. App. 2013 – Unpublished)

| | |
|---|---|
| OPINION FILED: | December 26, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 9, 2014 |

| SOURCE OF APPEAL: | |
|---|---|
| COURT: | Circuit |
| COUNTY: | Shawano |
| JUDGE: | James R. Habeck |

| JUSTICES: | |
|---|---|
| CONCURRED: | ABRAHAMSON, C.J., concurs. (Opinion filed.) |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, the cause was argued by *Sarah Schmeiser*, with whom on the brief was *Tracey Wood*, and *Tracey Wood & Associates*, Madison.


For the plaintiff-respondent, the cause was argued by *Christine A. Remington*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

2014 WI 134

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP1593-CR
(L.C. No. 2009CF202)

STATE OF WISCONSIN         :     IN SUPREME COURT

State of Wisconsin,

      Plaintiff-Respondent,

    v.

Michael R. Tullberg,

      Defendant-Appellant-Petitioner.

**FILED**

**DEC 26, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 ANNETTE KINGSLAND ZIEGLER, J. This is a review of an unpublished decision of the court of appeals[1] which affirmed Michael R. Tullberg's ("Tullberg") criminal convictions in Shawano County Circuit Court.[2] Tullberg appeals his judgment of conviction and the denial of his request for post-conviction relief. Specifically, he argues that the circuit court erred when it denied his motion to suppress a warrantless blood draw.

---

[1] State v. Tullberg, No. 2012AP1593-CR, unpublished slip op. (Wis. Ct. App. June 25, 2013) (per curiam).

[2] The Honorable James R. Habeck presided.

He seeks our review in light of <u>Missouri v. McNeely</u>, 569 U.S. ___, 133 S. Ct. 1552 (2013).

¶2 Tullberg was involved in a single-vehicle, fatal accident. There were several occupants of the vehicle, including the person who died as a result of the accident. The State alleged that Tullberg was the driver of the vehicle, was under the influence of an intoxicant, and was criminally responsible for, among other things, the fatality. Tullberg denied being the driver.

¶3 While Tullberg was being treated at the hospital, a sheriff's deputy instructed hospital staff to perform a warrantless blood draw. Tullberg argues that the blood draw evidence should have been suppressed because the blood draw was an unreasonable search without a warrant and thus unconstitutional. He argues that the good faith doctrine does not apply to this case.

¶4 The State argues that the blood draw was a constitutional search because it was supported by both probable cause and exigent circumstances. The State further asserts that, if exigent circumstances did not exist, the good faith doctrine nonetheless allowed the blood test result to be admitted into evidence.[3]

¶5 We conclude that the motion to suppress was properly denied because the warrantless draw of Tullberg's blood was

---

[3] We applied the good faith doctrine in a similar case. <u>See</u> <u>State v. Kennedy</u>, 2014 WI 132, ___ Wis. 2d ___, ___ N.W.2d ___.

supported by probable cause and exigent circumstances.  Because we conclude that the blood draw was constitutional, we need not address the good faith exception.

## I.  FACTUAL BACKGROUND

¶6  On July 30, 2009, Tullberg was involved in a fatal, one-vehicle accident in Shawano County when his truck ran off the road, struck a rock, flipped one or two times, and came to rest 70 feet from the rock, on the driver's side.  M.A., deceased, was pinned under the driver's side of the vehicle. The crash was so violent that the removable cap covering the truck bed behind the cabin was flattened and torn from the truck, loosening the cap's door in the process, and debris from the truck littered the accident scene.[4]  Based on cell phone records, the accident occurred between 12:18 a.m. and 12:26 a.m.

¶7  M.A., A.M., and C.M. were passengers in the truck at the time of the accident.  M.A., who was riding in the truck bed, fell out when the truck flipped over.  After the accident, Tullberg and A.M. spent approximately 15 minutes looking for M.A., but to no avail.  C.M. looked for M.A. for a few minutes and then left the scene because he was in violation of his probation.

¶8  Shortly thereafter, Tullberg's brother, Joseph Hauke ("Hauke"), arrived at the accident scene and gave Tullberg and

---

[4] Also known as a box, a truck bed is the large cargo area in the back of the truck, located behind the cabin area intended for passengers.

3

A.M. a ride to Tullberg's mother's house, which is located approximately five miles from the accident scene. Tullberg's mother gave Tullberg and A.M. a ride to the Langlade Memorial Hospital in Antigo, which is about 20 miles away. At 12:53 a.m., Tullberg's father called 9-1-1 to report the accident, and Hauke did the same shortly thereafter.

¶9 At approximately 12:55 a.m., Deputy Sheriff Justin Hoffman ("Deputy Hoffman") of the Shawano County Sheriff's Department was dispatched to the accident scene. At 1:03 a.m., the deputy arrived at the scene and spent the next 30 minutes there. No readily observable occupants or witnesses were at the scene. The terrain was rocky, steep, and wooded, and he described it as hazardous. Deputy Hoffman ultimately discovered M.A.'s body pinned under the driver's side of the truck. After he investigated and took photographs of the scene for five to ten minutes, firefighters and emergency medical services persons arrived at the scene.

¶10 While Deputy Hoffman was investigating the accident scene, Tullberg's father, Melvin Tullberg ("Melvin"), arrived at the scene. Melvin was very shaken up and speaking frantically. He told Deputy Hoffman that Tullberg owned the truck and that Tullberg and A.M. had gone to the hospital. Melvin told Deputy Hoffman several times that, according to Tullberg, a passenger who was riding in the bed of the truck was missing. Melvin stated that Tullberg spent several minutes looking for this passenger and implored Deputy Hoffman to look for him. Melvin said that Tullberg did not say whether he was the driver of the

4

truck when it crashed. Melvin began to walk along the roadside as if he was heading toward the crash site. Because Deputy Hoffman did not want Melvin to be near a traumatic crime scene, he physically guided Melvin to wait near his squad car. Melvin then received a phone call from Hauke and handed the phone to Deputy Hoffman. Hauke told Deputy Hoffman that Tullberg and A.M. were headed to Langlade Memorial Hospital.

¶11 When Deputy Bradley Schultz and Sergeant Michael Wizner ("Sergeant Wizner") arrived at the accident scene, Deputy Hoffman left to go to the Langlade Memorial Hospital. He spent approximately 30 minutes driving to the hospital.

¶12 Deputy Hoffman arrived at Langlade Memorial Hospital around 2:00 a.m. and interviewed Tullberg approximately ten minutes later. This interview lasted approximately ten minutes. Tullberg told Deputy Hoffman that M.A. was driving the truck when it crashed and that Tullberg did not know M.A.'s last name. Tullberg stated that he knew M.A. for only three days and never let M.A. drive his truck before that night. Tullberg said he was in the passenger seat of the truck when the accident happened and that he did not remember how he exited the truck. Tullberg said that the passenger's side airbag deployed. Tullberg stated that a fourth person may have been in the truck. Deputy Hoffman noticed that Tullberg appeared to have been struck by an airbag because hair on Tullberg's right forearm was singed consistent with friction from an airbag and because Tullberg smelled like the residue from a deployed airbag.

5

¶13 Tullberg admitted to Deputy Hoffman that he consumed alcohol that night, specifically, a mixed drink and a "Jäger bomb."[5] While interviewing Tullberg, Deputy Hoffman noticed that Tullberg had an odor of intoxicants, slurred speech, and bloodshot and glassy eyes. Based on these facts, Deputy Hoffman determined that Tullberg was intoxicated.

¶14 Deputy Hoffman next spent approximately five to ten minutes interviewing A.M., who was in a different room in the Langlade Memorial Hospital. A.M. said that when the accident happened, she was in the bed of the truck, M.A. was driving the truck, and Tullberg was riding in the passenger's seat.

¶15 After interviewing A.M. and while still at the hospital, Deputy Hoffman telephoned Sergeant Wizner to gather information about the accident scene. Sergeant Wizner told Deputy Hoffman that the airbag on the passenger's side had not deployed and that the airbag on the driver's side had deployed. Sergeant Wizner confirmed that the truck was lying on its driver's side and that its driver's side window was intact and partially rolled down.

¶16 Deputy Hoffman thereafter concluded that he had probable cause to believe that Tullberg was intoxicated and the driver of the truck at the time of the accident. Deputy Hoffman based this determination on the fact that the passenger's side

---

[5] A Jäger bomb is made by dropping a shot glass of Jägermeister (a 70-proof liqueur) into a glass of an energy drink, such as Red Bull® or Monster Energy®.

6

airbag did not deploy but the driver's side airbag did deploy. Tullberg appeared as if an airbag struck him because his right forearm hair was singed and he smelled like airbag residue. Further, Deputy Hoffman determined that even though Tullberg said that M.A. was the driver, the evidence indicated that M.A. could not have been the driver. M.A. was pinned underneath the driver's side of the truck, and the evidence from the accident scene showed that M.A. could not have been ejected from the vehicle. Specifically, the driver's side window was intact and partially rolled down. M.A., whose weight Deputy Hoffman estimated was between 240 and 250 pounds, could not have fit through the window opening. M.A. could not have been the driver and then pinned under the driver's side of the vehicle without being ejected from the vehicle. There was no indication that he could have been ejected. Also, Deputy Hoffman did not detect any airbag residue on M.A.

¶17 Simply stated, as a result of the information Deputy Hoffman learned from his observations and interview of Tullberg, coupled with the evidence at the scene of the accident, Deputy Hoffman determined that Tullberg had operated the motor vehicle while intoxicated.

¶18 Because of the facts and circumstances of this investigation, Deputy Hoffman did not follow standard protocol for an operating under the influence arrest. He did not administer field sobriety tests, issue a citation, arrest

7

Tullberg, or read the Informing the Accused form to Tullberg.[6] Deputy Hoffman testified that he did not follow the standard procedure because, among other things, Tullberg's medical condition was unknown, Tullberg was hospitalized after a serious car accident, and medical personnel needed to perform a Computerized Tomography scan ("CT scan") on Tullberg with some immediacy.

¶19 More than two and a half hours after the accident, Deputy Hoffman instructed medical staff to draw two vials of Tullberg's blood for testing.  He did not have a warrant. Deputy Hoffman believed that Tullberg's blood needed to be drawn urgently because, based on his training, he believed the alcohol in Tullberg's bloodstream was rapidly dissipating and time was of the essence.  Based on his training, Deputy Hoffman knew that a suspected drunken driver's blood should be drawn within three hours of an automobile accident in which the driver was involved.[7]  At 3:05 a.m. hospital staff drew Tullberg's blood. The blood test results indicated that Tullberg's blood alcohol concentration ("BAC") was 0.141, above the legal limit.

---

[6] Tullberg did not object to the blood draw.  However, the State does not argue that Tullberg consented to it.

[7] If a blood sample is taken more than three hours after an automobile accident, the blood draw evidence is admissible only if an expert testifies to its accuracy.  See Wis. Stat. §§ 885.235(1g), 885.235(3) (2009-10).  All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.  See also State v. Bohling, 173 Wis. 2d 529, 546, 494 N.W.2d 399 (1993), abrogated on other grounds by Missouri v. McNeely, 569 U.S. ___, 133 S. Ct. 1552 (2013).

## II.  PROCEDURAL POSTURE

¶20  On August 7, 2009, a warrant for Tullberg's arrest was issued.  On the next day, Tullberg turned himself in.

¶21 On August 10, 2009, Tullberg made an initial appearance and was charged in a criminal complaint with six offenses: homicide by intoxicated use of a motor vehicle,[8] second-degree reckless homicide,[9] two counts of operating while intoxicated causing injury,[10] failure to aid a victim or report a crime,[11] and obstructing an officer.[12]  On August 19, 2009, a preliminary hearing was conducted and Tullberg was bound over for trial.  An information was filed on August 21, 2009.  The information differed from the complaint only in that it replaced the second-degree reckless homicide charge with a charge of homicide by use of a vehicle with a prohibited alcohol concentration,[13] included a new charge of hit and run resulting in death,[14] and omitted the complaint's charge of failure to aid a victim or report a crime.  On August 24, 2009, the State filed

---

[8] Contrary to Wis. Stat. § 940.09(1)(a).

[9] Contrary to Wis. Stat. § 940.06(1).

[10] Contrary to Wis. Stat. § 346.63(2)(a)1.  One count was for injuring A.M. and the other count was for injuring C.M.

[11] Contrary to Wis. Stat. § 940.34(2)(a).  This count was for failing to aid M.A.

[12] Contrary to Wis. Stat. § 946.41(1).

[13] Contrary to Wis. Stat. § 940.09(1)(b).

[14] Contrary to Wis. Stat. § 346.67(1).

an amended information that included the six charges in the information and added two counts of operating with prohibited alcohol concentration causing injury[15] and one count of failure to aid a victim or report a crime.  On August 24, 2009, Tullberg was arraigned and entered pleas of not guilty.

¶22  On January 19, 2010, before McNeely was decided, Tullberg filed a motion to suppress the blood test results.  He argued, inter alia, that the blood draw was unconstitutional because it was not performed in compliance with legally recognized protocols, not done pursuant to implied consent laws or pursuant to a warrant, not done with his express consent, and not justified by exigent circumstances.  On May 25, 2010, the circuit court held a hearing on Tullberg's suppression motion.  After hearing the evidence presented and considering the arguments of counsel, the circuit court concluded that exigent circumstances justified the warrantless blood draw.  The circuit court denied the suppression motion.

¶23  On March 28 through April 1, 2011, Tullberg was tried before a jury.  The jury found Tullberg guilty of six counts.  On May 31, 2011, the circuit court sentenced Tullberg.

¶24  On February 3, 2012, Tullberg filed a motion for post-conviction relief, seeking a new trial.  He argued, inter alia, that the circuit court erred in denying Tullberg's motion to suppress the blood draw evidence because the blood draw was

---

[15] Contrary to Wis. Stat. § 346.63(2)(a).  The victims of these counts were A.M. and C.M.

unconstitutional. On June 27, 2012, the circuit court denied the motion for post-conviction relief. These proceedings also occurred before McNeely was decided.

¶25 Tullberg appealed his conviction. On June 25, 2013, the court of appeals upheld the circuit court's judgment of conviction and order denying his motion for post-conviction relief. The court of appeals reasoned that both probable cause and exigent circumstances supported the blood draw.[16] McNeely was decided before the court of appeals issued its decision.

¶26 On July 17, 2013, Tullberg petitioned this court for review. On February 19, 2014, we granted review. The petition requests review to clarify the law relating to exigent circumstances under McNeely.

### III. STANDARD OF REVIEW

¶27 "Our review of an order granting or denying a motion to suppress evidence presents a question of constitutional fact." State v. Robinson, 2010 WI 80, ¶22, 327 Wis. 2d 302, 786 N.W.2d 463 (citing State v. Hughes, 2000 WI 24, ¶15, 233 Wis. 2d 280, 607 N.W.2d 621). "When presented with a question of constitutional fact, this court engages in a two-step inquiry." Id. (citing State v. Pallone, 2000 WI 77, ¶27, 236 Wis. 2d 162, 613 N.W.2d 568; Hughes, 233 Wis. 2d 280, ¶15). "First, we review the circuit court's findings of historical fact under a deferential standard, upholding them unless they

---

[16] The court of appeals also resolved other issues not petitioned to this court.

11

are clearly erroneous." Id. (citations omitted). "Second, we independently apply constitutional principles to those facts." Id. (citations omitted).

¶28 We apply this two-step inquiry when determining whether exigent circumstances justified a warrantless search, State v. Richter, 2000 WI 58, ¶26, 235 Wis. 2d 524, 612 N.W.2d 29, and whether a law enforcement officer had probable cause, State v. Popke, 2009 WI 37, ¶10, 317 Wis. 2d 118, 765 N.W.2d 569.

IV. ANALYSIS

¶29 "The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" Robinson, 327 Wis. 2d 302, ¶24 (citations omitted).[17] "The touchstone of the Fourth Amendment

---

[17] The Fourth Amendment to the United States Constitution provides in full:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, Section 11 of the Wisconsin Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable

(continued)

12

is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citing Katz v. United States, 389 U.S. 347, 360 (1967)). "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." Id. (citing Illinois v. Rodriguez, 497 U.S. 177 (1990)).

¶30 A warrantless search is presumptively unreasonable, State v. Henderson, 2001 WI 97, ¶19, 245 Wis. 2d 345, 629 N.W.2d 613, and is constitutional only if it falls under an exception to the warrant requirement, State v. Krajewski, 2002 WI 97, ¶24, 255 Wis. 2d 98, 648 N.W.2d 385. One exception to the warrant requirement is the exigent circumstances doctrine, which holds that a warrantless search complies with the Fourth Amendment if the need for a search is urgent and insufficient time to obtain a warrant exists. Robinson, 327 Wis. 2d 302, ¶24.

¶31 A blood draw to uncover evidence of a crime is a search within the meaning of the Fourth Amendment. State v. Bentley, 92 Wis. 2d 860, 863-64, 286 N.W.2d 153 (Ct. App. 1979). A warrantless, nonconsensual blood draw of a suspected drunken driver complies with the Fourth Amendment if: (1) there was

---

cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

We generally interpret the search and seizure provision of our state constitution consistent with the United States Supreme Court's interpretation of the Fourth Amendment. State v. Robinson, 2010 WI 80, ¶24 n.11, 327 Wis. 2d 302, 786 N.W.2d 463 (citations omitted).

13

probable cause to believe the blood would furnish evidence of a crime; (2) the blood was drawn under exigent circumstances; (3) the blood was drawn in a reasonable manner; and (4) the suspect did not reasonably object to the blood draw. State v. Erickson, 2003 WI App 43, ¶9, 260 Wis. 2d 279, 659 N.W.2d 407; Schmerber v. California, 384 U.S. 757, 769-71 (1966).

¶32 We first examine whether Deputy Hoffman had probable cause to instruct hospital staff to draw Tullberg's blood. Next we consider whether exigent circumstances justified the warrantless blood draw. Tullberg has conceded that his blood was drawn in a reasonable manner and that he did not reasonably object to the blood draw. Finally, we analyze Tullberg's argument that a suspected drunken driver must be arrested before his or her blood may be drawn without a search warrant. We conclude that probable cause and exigent circumstances justified the warrantless blood draw. Tullberg did not need to be under arrest before his blood could be drawn.

A. Probable Cause to Search

¶33 "In the search context, probable cause requires a 'fair probability' that contraband or evidence of a crime will be found in a particular place." Robinson, 327 Wis. 2d 302, ¶26 (quoting Hughes, 233 Wis. 2d 280, ¶21) (quotation marks omitted). To have probable cause to search a suspect, a law enforcement officer must be aware of and reasonably believe evidence that shows the suspect's guilt of a crime is more than a possibility, although the evidence need not show the suspect's guilt is more likely than not. State v. Richardson, 156

14

Wis. 2d 128, 148-49, 456 N.W.2d 830 (1990) (citing State v. Nordness, 128 Wis. 2d 15, 35, 381 N.W.2d 300 (1986); State v. Paszek, 50 Wis. 2d 619, 625, 184 N.W.2d 836 (1971)). To determine whether probable cause to search existed, a court determines whether law enforcement acted reasonably. Robinson, 327 Wis. 2d 302, ¶26 (citing Rodriguez, 497 U.S. at 185; Illinois v. Gates, 462 U.S. 213, 231 (1983); Hughes, 233 Wis. 2d 280, ¶23). A reviewing court considers the totality of the circumstances to determine whether probable cause to search existed. State v. Ward, 2000 WI 3, ¶26, 231 Wis. 2d 723, 604 N.W.2d 517 (citing State v. DeSmidt, 155 Wis. 2d 119, 131, 454 N.W.2d 780 (1990)).

¶34 We conclude that, under the totality of the circumstances, Deputy Hoffman had probable cause to believe that a test of Tullberg's blood would produce evidence that Tullberg had operated a motor vehicle while intoxicated. Deputy Hoffman relied on several factors to conclude that Tullberg was under the influence of an intoxicant. While interviewing Tullberg in the hospital, Deputy Hoffman noticed that Tullberg's speech was slurred, his eyes were glassy and bloodshot, and his breath smelled of intoxicants. Tullberg admitted to Deputy Hoffman that he had multiple alcoholic drinks that night. These facts establish that Deputy Hoffman reasonably believed that Tullberg was intoxicated. See State v. Kasian, 207 Wis. 2d 611, 622, 558 N.W.2d 687 (Ct. App. 1996) (holding that an officer had probable cause to arrest defendant for operating while intoxicated because defendant smelled of intoxicants, his speech was

15

slurred, he was injured, and he was lying next to his van which had struck a telephone pole); Erickson, 260 Wis. 2d 279, ¶¶15-16 (holding that an officer had probable cause to have defendant's blood drawn because defendant smelled strongly of intoxicants, crashed her truck into another vehicle, admitted to drinking one to three beers, and had recently left an all-night party).

¶35 Tullberg argues that bloodshot and glassy eyes are not a sign of intoxication, relying on a National Highway Traffic and Safety Administration study regarding the accuracy of clues that law enforcement officers use to determine whether someone is intoxicated.[18] The study argues that law enforcement officers should not consider bloodshot and glassy eyes to be an indicator of intoxication because such eye conditions may be caused by allergies or shift work. However, the study does not conclude that intoxication does not cause eyes to become bloodshot and glassy. We reaffirm that a law enforcement officer may consider bloodshot and glassy eyes to be one of several indicators of intoxication, even though such eye descriptors may have an innocent explanation. See Robinson, 327 Wis. 2d 302, ¶29 ("'[I]nnocent' behavior frequently will provide the basis for a showing of probable cause.'") (quoting Gates, 462 U.S. at 243 n.13).

---

[18] Jack Stuster, U.S. Department of Transportation, NHTSA Final Report, The Detection of DWI at BACS below 0.10, DOT HS-808-654 (Sept. 1997) at 14 and E-10.

16

¶36 Deputy Hoffman also reasonably believed that Tullberg was the operator of the truck when it crashed. Again, the deputy did not rely on one fact alone. First, Tullberg owned the truck, which supports Deputy Hoffman's view that he was the driver. Second, an airbag deployed only on the driver's side of the truck, and Tullberg appeared as if an airbag struck him. Specifically, he looked like an airbag struck him because the hair on his right forearm was singed consistent with friction from a deploying airbag. He smelled like airbag residue, which also suggests that the airbag struck him. Deputy Hoffman made these observations about Tullberg's appearance while interviewing him, and Deputy Hoffman subsequently confirmed with Sergeant Wizner over the telephone that an airbag deployed only on the driver's side of the truck. Thus, Deputy Hoffman reasonably concluded that the driver's side airbag struck Tullberg. Third, Deputy Hoffman determined that A.M. was not the driver of the truck because she did not have singed hair on either arm or smell like airbag residue. Finally, Deputy Hoffman reasonably believed that Tullberg lied when he said that he was the passenger and M.A. was the driver of the truck when it crashed. Specifically, not only did the airbag evidence indicate that Tullberg was the driver, but Deputy Hoffman knew that M.A.'s body was pinned underneath the truck and that the driver's side window of the truck was intact and partially rolled down. Deputy Hoffman estimated M.A.'s weight to be between 240 and 250 pounds and determined that M.A. could not have been ejected from the truck through the window opening.

17

Further, Tullberg's father told Deputy Hoffman that Tullberg said that a person who was riding in the truck bed when the truck crashed was missing, and Deputy Hoffman discovered that M.A. was the missing person. Deputy Hoffman did not smell airbag residue on M.A. Based on all of this evidence, Deputy Hoffman reasonably believed that Tullberg was the driver of the truck when it crashed.

¶37 Because Deputy Hoffman reasonably believed that Tullberg was intoxicated and that Tullberg was the driver of the truck when it crashed, he had probable cause to believe that Tullberg had operated a motor vehicle while intoxicated.[19]

¶38 Relying on State v. Seibel, 163 Wis. 2d 164, 471 N.W.2d 226 (1991), and State v. Swanson, 164 Wis. 2d 437, 475 N.W.2d 148 (1991), Tullberg argues that the facts in the present case do not establish probable cause that he was operating while intoxicated. First, he argues that Seibel is factually similar to this case, and in Seibel this court held that an officer had reasonable suspicion that the defendant was operating while intoxicated. Tullberg argues that, because reasonable suspicion is a lesser burden of proof than probable cause, there was no

---

[19] Tullberg argues that Deputy Hoffman should have investigated Tullberg's claim that a fourth person might have been in the truck when it crashed. However, Tullberg does not argue that he told Deputy Hoffman that this fourth person was driving the truck when it crashed or even that he said this fourth person was definitely in the truck. Even if Tullberg had claimed this fourth person was driving the truck when it crashed, Deputy Hoffman still had probable cause to believe that Tullberg was the driver.

probable cause in Seibel. However, this court in Seibel never determined whether the facts in that case established probable cause that the defendant was operating while intoxicated. See Seibel, 163 Wis. 2d at 172-79.[20] Instead, Seibel analyzed whether a law enforcement officer had reasonable suspicion to perform a warrantless blood draw subsequent to a lawful arrest. Id. at 180-83.

¶39 Tullberg next argues that this court in Swanson held that erratic driving and a subsequent automobile accident around the time that bars close did not constitute probable cause of operating while intoxicated. By analogy, he argues that probable cause was lacking in the present case. Tullberg misinterprets Swanson. The court in Swanson expressly declined to determine whether probable cause existed. Swanson, 164

---

[20] In a footnote in Swanson, this court stated in passing that the Seibel court held that probable cause did not exist in that case. State v. Swanson, 164 Wis. 2d 437, 453 n.6, 475 N.W.2d 148 (1991). This statement in Swanson is incorrect. The court in Seibel did not even consider whether probable cause existed. See State v. Seibel, 163 Wis. 2d 164, 172-83, 471 N.W.2d 226 (1991).

Wis. 2d at 453 & n.6.[21] Instead, the issue in Swanson was whether the search-incident-to-arrest exception to the warrant requirement justified a search that preceded an arrest. Id. at 441-42.

¶40 Tullberg also argues that Deputy Hoffman lacked probable cause to determine that Tullberg was operating while intoxicated because Tullberg did not perform a field sobriety test. Tullberg notes that field sobriety tests preceded determinations of probable cause in State v. Colstad, 2003 WI App 25, 260 Wis. 2d 406, 659 N.W.2d 394, and State v. Begicevic, 2004 WI App 57, 270 Wis. 2d 675, 678 N.W.2d 293. However, in his reply brief, Tullberg correctly acknowledges that a law enforcement officer need not administer a field sobriety test in order to have probable cause that a suspect operated while

---

[21] In any event, the present case has more evidence of intoxication than Seibel or Swanson did. In Seibel this court held that an officer had reasonable suspicion that Seibel was operating while intoxicated because Seibel was driving erratically, he caused a car accident, police officers smelled intoxicants emanating from Seibel's traveling companions, a police officer thought he smelled intoxicants on Seibel, and Seibel was belligerent. Seibel, 163 Wis. 2d at 180-83. In Swanson this court stated that officers had reasonable suspicion that Swanson was operating while intoxicated because his driving was erratic near the time bars close and because his breath smelled of intoxicants. Swanson, 164 Wis. 2d at 453 n.6. In contrast, in the present case, Tullberg smelled of intoxicants, admitted to consuming alcohol, had slurred speech, and had bloodshot and glassy eyes.

intoxicated.[22]  E.g., Kasian, 207 Wis. 2d at 622.  Tullberg nevertheless argues that probable cause is lacking under the facts of the present case because Tullberg did not perform a field sobriety test.  We disagree because field sobriety tests are not always possible, let alone required, and because probable cause existed in this case without a field sobriety test.

## B. Exigent Circumstances

¶41  "Like our analysis of probable cause, the test for determining the existence of exigent circumstances is an objective one."  Robinson, 327 Wis. 2d 302, ¶30 (citing Brigham

---

[22] However, in his opening brief, Tullberg seems to argue that this court in Swanson held that a field sobriety test is required in order to establish probable cause of operating while intoxicated.  In a footnote in Swanson, this court stated: "Unexplained erratic driving, the odor of alcohol, and the coincidental time of the incident form the basis for a reasonable suspicion but should not, in the absence of a field sobriety test, constitute probable cause to arrest someone for driving while under the influence of intoxicants."  Swanson, 164 Wis. 2d at 453 n.6.  However, we later clarified that "Swanson did not announce a general rule requiring field sobriety tests in all cases as a prerequisite for establishing probable cause to arrest a driver for operating a motor vehicle while under the influence of an intoxicant."  Washburn Cnty. v. Smith, 2008 WI 23, ¶33, 308 Wis. 2d 65, 746 N.W.2d 243; see also State v. Kasian, 207 Wis. 2d 611, 622, 558 N.W.2d 687 (Ct. App. 1996) (stating that Swanson did not require an officer to administer a sobriety test before determining probable cause exists to arrest a suspect for operating while intoxicated).  Instead, probable cause is based on the totality of the circumstances on a case-by-case basis.  Smith, 308 Wis. 2d 65, ¶¶34-35; State v. Ward, 2000 WI 3, ¶26, 231 Wis. 2d 723, 604 N.W.2d 517; State v. Lange, 2009 WI 49, ¶¶42-43, 317 Wis. 2d 383, 766 N.W.2d 551 (Ziegler, J., concurring); State v. Kennedy, 2014 WI 132, ¶21, ___ Wis. 2d ___, ___ N.W.2d ___.

21

City, Utah v. Stuart, 547 U.S. 398, 403-04 (2006); State v. Smith, 131 Wis. 2d 220, 230, 388 N.W.2d 601 (1986)). To determine if exigent circumstances justified a search, a reviewing court determines "whether the police officers under the circumstances known to them at the time reasonably believed that a delay in procuring a warrant would . . . risk the destruction of evidence." Id. (citing Smith, 131 Wis. 2d at 230).

¶42 Evidence of a crime is destroyed as alcohol is eliminated from the bloodstream of a drunken driver. McNeely, 133 S. Ct. at 1556. "[W]hile the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, . . . it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances."[23] Id. at 1563. Ultimately, "[i]n those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Id. at 1561. Stated differently, although the dissipation of alcohol in the bloodstream of a suspected drunken driver alone does not constitute an exigency justifying a warrantless draw of the

---

[23] Because we consider the totality of the circumstances, no single fact is dispositive. See State v. Hughes, 2000 WI 24, ¶41, 233 Wis. 2d 280, 607 N.W.2d 621.

22

suspect's blood, the totality of the circumstances may justify a warrantless blood draw. See id. ("[S]ome circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test."). While McNeely changed the landscape of warrantless blood draws in Wisconsin, we note that the United States Supreme Court left room for warrantless blood draws if exigencies exist. In fact, the Court in McNeely used the term "exigent" or "exigency" no fewer than ten times in the majority opinion. Thus, today we determine whether, under the totality of the circumstances, exigent circumstances justified the warrantless blood draw.

¶43 We conclude that, under the totality of the circumstances, the draw of Tullberg's blood was justified by exigent circumstances. A reasonable law enforcement officer, confronted with this accident scene and these circumstances, would reasonably conclude that the totality of the circumstances rendered a warrantless blood draw necessary.

¶44 At the outset, we note that Deputy Hoffman did not improperly delay in obtaining a warrant. He did not have probable cause to believe that Tullberg operated the motor vehicle while under the influence of an intoxicant until nearly three hours after the accident. If anything, Tullberg's actions, rather than the deputy's, necessitated the warrantless blood draw.

¶45 Deputy Hoffman was dispatched in the early morning hours to a horrific accident which involved a fatality. The

23

accident scene's terrain was rocky, wooded, steep, and trying. No witnesses were available to be interviewed. After he investigated the scene for five to ten minutes, firefighters and emergency medical services persons arrived, followed shortly thereafter by the arrival of Tullberg's frantic father, Melvin. Deputy Hoffman reasonably called for backup, secured the scene, talked with Melvin, spoke with Tullberg's brother over the phone, and determined that he needed to go to the hospital to investigate further.

¶46 We observe that Tullberg went from the accident scene to his mother's house and then to a hospital in another county. Tullberg's hospitalization required Deputy Hoffman to spend 30 minutes driving from the accident scene to the hospital, further delaying his ability to interview Tullberg. See Schmerber, 384 U.S. at 770-71 (holding that exigent circumstances justified warrantless draw of suspected drunken driver's blood partly because the defendant went to a hospital after a car accident).

¶47 At the hospital, Tullberg and A.M. tried to mislead the deputy into believing that the deceased, M.A., was the driver of the truck when it crashed. Tullberg falsely stated that M.A. was the driver.[24] This deception required the deputy to conduct additional investigation in order to determine who the driver of the vehicle was at the time of the accident. Specifically, this deception required Deputy Hoffman to question

---

[24] Tullberg was convicted of obstructing an officer for lying to Deputy Hoffman.

24

A.M. about who was driving the truck and to call Sergeant Wizner to learn more information about the accident to determine who was driving the truck. Ultimately, Deputy Hoffman had probable cause to believe that Tullberg had operated a motor vehicle while intoxicated, but only more than two and a half hours after the accident. See id. at 769, 771 (holding that exigency justified warrantless draw of suspected drunken driver's blood that was performed more than two hours after car accident). Deputy Hoffman, confronted with such an accident scene and obstruction of his investigation, conducted himself reasonably.

¶48 Furthermore, at the time of the blood draw, Deputy Hoffman knew that hospital staff was about to perform a CT scan on Tullberg. The procedure could very well have taken a considerable amount of time, and the CT scan could have revealed that Tullberg needed immediate subsequent medical treatment. The blood draw occurred more than two and a half hours after the accident. Thus, if the blood draw had occurred after the CT scan, the blood draw could have occurred long after the accident, if ever. Based on his training, Deputy Hoffman knew that a motorist's blood sample should be taken within three hours of an automobile accident to ensure its accuracy and admissibility as evidence. Deputy Hoffman therefore determined that Tullberg's blood needed to be drawn before the CT scan to ensure the blood was drawn within three hours of the accident. Moreover, because Deputy Hoffman did not know whether the CT scan would lead to subsequent medical treatment, he determined that delaying the blood draw until after the CT scan could

25

result in the blood draw occurring much later than three hours after the accident, if ever. Under these circumstances, Deputy Hoffman could not have "reasonably obtain[ed] a warrant . . . without significantly undermining the efficacy of the search . . . ."[25] See McNeely, 133 S. Ct. at 1561.

¶49 A law enforcement officer, such as Deputy Hoffman, who is confronted with an accident scene, should first attend to the emergency circumstances at hand. Deputy Hoffman properly spent 30 minutes investigating the accident scene. See Schmerber, 384 U.S. at 769, 770-71 (holding that exigent circumstances justified warrantless draw of suspected drunken driver's blood partly because officer needed to investigate the scene of a car accident); McNeely, 133 S. Ct. at 1568 ("the need for the police to attend to a car accident" is one factor that the exigency analysis may consider). Deputy Hoffman did not spend an unreasonable amount of time at the accident scene. He was the

_____

[25] To get a warrant to draw Tullberg's blood, Deputy Hoffman would have needed to contact dispatch, who in turn would have contacted a prosecutor for him. The prosecutor would have contacted a staff member from the district attorney's office, and together they would have prepared a warrant application. The prosecutor then would have contacted a judge. In light of this process, Deputy Hoffman could not have obtained a warrant to draw Tullberg's blood before the CT scan, which Tullberg urgently needed. Performing a blood draw on Tullberg after the CT scan would have significantly undermined the efficacy of the blood draw. We note that Deputy Hoffman could not have had other officers assist him in obtaining a warrant while he investigated the accident because he did not have probable cause to have Tullberg's blood drawn until immediately before it was drawn.

26

first person to respond to the accident, he discovered a body under the truck, and he had to interact with Tullberg's frantic father, Melvin, and other emergency personnel.  He did not know that Tullberg owned the vehicle until Melvin arrived at the scene, and he did not know where Tullberg was until he spoke with Tullberg's brother.  Deputy Hoffman headed directly to the hospital once other law enforcement officers arrived at the accident scene to relieve him.  An accident scene, such as the one at issue, can create exigent circumstances which would justify a warrantless blood draw.

¶50 Viewing the totality of these facts and circumstances, Deputy Hoffman reasonably responded to the accident, secured the scene, investigated the matter, and ultimately was left with a very narrow time frame in which Tullberg's blood could be drawn so as to produce reliable evidence of intoxication.  This sort of "now or never" moment is the epitome of an exigent circumstance.  See McNeely, 133 S. Ct. at 1561 ("The context of blood testing is different in critical respects from other destruction-of-evidence cases in which the police are truly confronted with a 'now or never' situation.") (quoting Roaden v. Kentucky, 413 U.S. 496, 505 (1973)) (quotation marks omitted).  However, we do not mean to suggest that a warrantless blood draw would always require a "now or never" situation in order to be justified by exigent circumstances.  Rather, exigent circumstances justify a warrantless blood draw if delaying the blood draw would "significantly undermin[e] [its] efficacy."

27

See id. The "now or never" moment in the present case quite clearly meets that test.[26]

¶51 Based on the foregoing discussion, we conclude that exigent circumstances justified the warrantless draw of Tullberg's blood. Deputy Hoffman acted reasonably and the touchstone of the Fourth Amendment is reasonableness. See Robinson, 327 Wis. 2d 302, ¶26; McNeely, 133 S. Ct. at 1558-60.

C. Arrest Not Necessary

¶52 Tullberg argues that the warrantless draw of his blood was unconstitutional because he was not arrested before the blood draw. We disagree.

¶53 Specifically, Tullberg argues that Schmerber and State v. Bohling, 173 Wis. 2d 529, 494 N.W.2d 399 (1993), required an officer to arrest a suspect before having a sample of his or her blood taken. Although the defendant in Schmerber was arrested before his blood sample was taken, the Supreme Court in Schmerber never suggested that a warrantless blood draw would be

---

[26] In particular, although a blood sample taken more than three hours after an accident can be admissible as evidence, Deputy Hoffman reasonably concluded that allowing Tullberg to undergo a CT scan before undergoing a blood draw would have "significantly undermin[ed] the efficacy" of the blood draw. See McNeely, 133 S. Ct. at 1561; see also id. at 1560-61 ("[B]ecause an individual's alcohol level gradually declines soon after he stops drinking, a significant delay in testing will negatively affect the probative value of the results."); id. at 1563 ("While experts can work backwards from the BAC at the time the sample was taken to determine the BAC at the time of the alleged offense, longer intervals may raise questions about the accuracy of the calculation.").

unconstitutional unless performed subsequent to an arrest. In fact, the Supreme Court in McNeely stated that "'absent an emergency, [a search warrant is] required where intrusions into the human body are concerned,' even when the search was conducted following a lawful arrest." McNeely, 133 S. Ct. at 1558 (quoting Schmerber, 384 U.S. at 770). This quote suggests that an exigency renders a warrantless blood draw constitutional, regardless of whether the blood draw is performed subsequent to a lawful arrest.

¶54 Tullberg's reliance on Bohling is also misplaced. In Bohling, this court held that

> a warrantless blood sample taken at the direction of a law enforcement officer is permissible under the following circumstances: (1) the blood draw is taken to obtain evidence of intoxication from a person lawfully arrested for a drunk-driving related violation or crime,[1] (2) there is a clear indication that the blood draw will produce evidence of intoxication, (3) the method used to take the blood sample is a reasonable one and performed in a reasonable manner, and (4) the arrestee presents no reasonable objection to the blood draw.

Bohling, 173 Wis. 2d at 533-34. In footnote one, the court explained that "[p]robable cause to arrest substitutes for the predicate act of lawful arrest." Id. at 534 n.1 (citing Bentley, 92 Wis. 2d at 863-64). Tullberg argues that Bentley is inapposite because it was abrogated by McNeely. Indeed, the McNeely Court expressly abrogated Bohling's holding that dissipation of alcohol in the bloodstream of a suspected drunken driver categorically constitutes an exigency. See McNeely, 133 S. Ct. at 1558 & n.2; State v. Kennedy, 2014 WI 132, ¶29, ___

29

Wis. 2d ___, ___ N.W.2d ___. However, the McNeely Court left intact the holding in Bentley and Bohling that an arrest need not precede a warrantless blood draw.

¶55 In sum, the Fourth Amendment provides sufficient protection such that an arrest need not precede a warrantless blood draw. When there is probable cause for a blood draw, as there is in the case at issue, there also is probable cause to arrest for operating while intoxicated. An arrest is not a prerequisite to a warrantless blood draw justified by probable cause and exigent circumstances.

¶56 Accordingly, we reaffirm that an arrest of a suspected drunken driver need not precede a warrantless draw of the suspect's blood in order for the blood draw to be constitutional. See Erickson, 260 Wis. 2d 279, ¶¶5-12.

## V. CONCLUSION

¶57 We conclude that the motion to suppress was properly denied because the warrantless draw of Tullberg's blood was supported by probable cause and exigent circumstances. Because we conclude that the blood draw was constitutional, we need not address the good faith exception.

*By the Court.*—The decision of the court of appeals is affirmed.

¶58 SHIRLEY S. ABRAHAMSON, C.J. *(concurring).* The instant case is part of a trilogy of cases examining the constitutionality of warrantless, nonconsensual blood draws performed on persons suspected of driving under the influence of an intoxicant in light of Missouri v. McNeely, 133 S. Ct. 1552 (2013). The other two cases in this trilogy are State v. Kennedy, 2014 WI 132, ___ Wis. 2d ___, ___ N.W.2d ___, and State v. Foster, 2014 WI 131, ___ Wis. 2d ___, ___ N.W.2d ___. For a discussion of these three opinions, including the instant case, and the issues arising therein, see my dissenting opinion in State v. Foster, 2014 WI 131, ___ Wis. 2d ___, ___ N.W.2d ___.