COURT OF APPEALS
DECISION
DATED AND FILED

February 15, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP2006-CR**

Cir. Ct. No. 2019CF44

STATE OF WISCONSIN

**IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CHRISTINA MARIE WIEDERIN,

DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for St. Croix County: R. MICHAEL WATERMAN, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Gill, JJ.

¶1 GILL, J. This case arises from a 2018 warrantless blood draw that police ordered to be performed on Christina Wiederin while she was unconscious in the hospital after she was involved in a fatal car accident. The circuit court denied Wiederin's motion to suppress the blood test results, concluding that circumstances

the officers faced at the crash scene and at the hospital were "the epitome of exigent circumstances" that justified a warrantless blood draw.

¶2    On appeal, Wiederin argues that the circuit court erred by concluding that her warrantless blood draw was justified by exigent circumstances. Wiederin asserts that the officers had multiple opportunities to read her the Informing the Accused form and to obtain her consent to a blood draw. She further argues that there was nothing preventing the officers from timely applying for a warrant. Based on the totality of the circumstances, we conclude that exigent circumstances justified the warrantless blood draw. Accordingly we affirm.[1]

## BACKGROUND

¶3    On December 21, 2018, at approximately 11:10 p.m., police were dispatched to a report of a vehicle driving the wrong way on a divided highway near New Richmond. Shortly thereafter, another dispatch reported a head-on collision. Deputy Jeff Hillstead arrived at the scene of the crash and observed a white vehicle on the road and a black vehicle on the median. Hillstead further observed that the driver of the white vehicle showed no signs of life.

¶4    Deputy Hillstead spoke to witnesses on the scene who reported seeing the black vehicle traveling the wrong direction on the highway. Hillstead identified the driver of the black vehicle as Wiederin. Wiederin stated that she had been drinking but did not know how much alcohol she had consumed. Hillstead observed

---

[1] In the alternative, the State argues that even if exigent circumstances did not justify the blood draw, the results were properly not suppressed because an officer could have relied in good faith on the implied consent law to justify the blood draw. We need not address this issue because we agree with the circuit court that exigent circumstances justified the warrantless blood draw. *See Miesen v. DOT*, 226 Wis. 2d 298, 309, 594 N.W.2d 821 (Ct. App. 1999) (court of appeals "should decide cases on the narrowest possible grounds").

2

that Wiederin spoke softly and appeared to be in serious condition. He also observed a bottle sticking out of drawstring bag that was located on the passenger side floor of the vehicle, but he could not determine if it was an alcohol bottle.

¶5 Fire department personnel arrived on the scene and after about thirty minutes, they were able to extricate Wiederin from her vehicle. Once Wiederin was out of her vehicle, law enforcement asked emergency personnel if they would conduct a legal blood draw if Wiederin consented to it; however, a medic refused because medical personnel did not want to delay medical treatment in order to perform a blood draw. Wiederin was transported to a hospital in St. Paul, Minnesota, at 12:16 a.m.

¶6 Sergeant Thomas Williams drove to the sheriff's department to obtain a blood test kit and then drove to the hospital where Wiederin was transported, arriving at 1:05 a.m. Law enforcement investigating at the scene of the accident discovered that the drawstring bag contained a bottle of rum "that was over half gone," and a bottle of Diet Coke. A plastic sandwich baggy with a trace amount of suspected marijuana and a "one-hitter pipe commonly used to smoke marijuana" were also found. Law enforcement relayed this information to Williams by phone prior to his arrival at the hospital.

¶7 When Sergeant Williams arrived at the hospital, he was told that a blood draw was not possible as Wiederin was "in imaging," and she would be taken into surgery immediately thereafter. After Williams explained the severity of the crash and the importance of the blood draw to the attending nurse, the nurse contacted another nurse in imaging who said that Williams could see Wiederin before she went into surgery. Williams learned, however, that Wiederin had been administered drugs that were causing her to go in and out of consciousness.

¶8 When Sergeant Williams got to imaging, he observed that Wiederin's eyes were open. Williams said Wiederin's name, and she responded, "hi." Williams proceeded to read to Wiederin the Informing the Accused form and requested a blood sample. Wiederin, however, became unconscious and did not respond.

¶9 Sergeant Williams believed exigent circumstances requiring the blood draw at that time existed because Wiederin was about to be taken into surgery and, after that occurred, there may be no later opportunity for a timely blood draw. Williams therefore asked a nurse to conduct a blood draw, which occurred at approximately 2:00 a.m. The blood sample revealed an alcohol concentration of 0.222, as well as the presence of 7.9 ng/mL of Delta-9 THC, a restricted controlled substance.

¶10 Sergeant Williams testified that he did not seek a search warrant because when a suspect is conscious, like Wiederin was at the scene, the sheriff department's policy was to ask for consent prior to obtaining a warrant. Moreover, Williams stated that no other officers were available to apply for a search warrant. Williams further testified that when he went to the hospital, he planned to ask Wiederin for a blood sample, and if she refused, he would apply for a search warrant. Williams explained that, to the best of his knowledge, a Wisconsin officer who wanted to obtain a search warrant in Minnesota would have to draft a warrant; contact the St. Paul watch commander, who in turn would place the Wisconsin officer in touch with someone to assist with an electronic warrant application; and then find a judge to sign the warrant. Williams explained that he had never applied for a Minnesota warrant and he did not know how long the process would take to obtain one.

¶11     The State ultimately charged Wiederin with eight crimes: homicide by intoxicated use of a vehicle while having a prior intoxicant-related conviction; homicide by use of a vehicle with a prohibited alcohol concentration while having a prior intoxicant-related conviction; homicide by use of a vehicle with a detectable amount of a restricted controlled substance in her blood; possession of drug paraphernalia; and four counts of first-degree recklessly endangering safety.[2] Wiederin moved to suppress her blood test results, asserting that the warrantless blood draw violated the Fourth Amendment.

¶12     The circuit court denied Wiederin's suppression motion because it concluded that the blood draw was justified by exigent circumstances. The court noted that Wiederin "was seriously injured and trapped in her car for nearly an hour" and was "inaccessible to law enforcement" officers during that time. The court found that, while at the scene, "[a]t no point, did the officers have available staff or sufficient time to apply for a warrant, much less have access to Ms. Wiederin to execute it while she was in Wisconsin."

¶13     The circuit court concluded that "[t]he exigency went unabated in Minnesota." The court noted that Wiederin was inaccessible to law enforcement for nearly an hour while she was being examined in the imaging room. The court recognized that Sergeant Williams "needed to wait until [Wiederin] became available, and he had no way of knowing when that would happen." The court found that had Williams left the hospital to attempt to obtain a warrant, he "easily could have missed his opportunity to see Ms. Wiederin," and that "had it not been for Deputy [sic] Williams persuading the right nurse at the right time, Ms. Wiederin

_____

[2] The recklessly endangering safety charges related to four juveniles in another vehicle, whose driver had to take evasive action to avoid Wiederin's car hitting the juveniles' car head-on while Wiederin was driving the wrong way on the highway.

would have been moved to surgery and beyond the reach of the law, presumably for hours." The court further found that the officers who remained at the scene "were all fully occupied with high-priority, time sensitive tasks that could not be responsibly postponed for a warrant application."

¶14 As part of a plea agreement, Wiederin pled no contest to two crimes: first-degree recklessly endangering safety and homicide by use of a motor vehicle with a detectable presence of a restricted controlled substance in her blood. The remaining charges were dismissed and read in at sentencing. The circuit court imposed fifteen years' initial confinement and ten years' extended supervision for the homicide crime and a concurrent sentence of seven and one-half years' initial confinement and five years' extended supervision for the first-degree recklessly endangering safety crime. Wiederin now appeals, challenging the denial of her suppression motion. Additional facts will be included as relevant to the discussion.

## DISCUSSION

¶15 We review a motion to suppress under a two-prong analysis: first, we review the circuit court's findings of historical fact and uphold them unless they are clearly erroneous; and, second, we review the application of constitutional principles to those facts de novo. *State v. Tullberg*, 2014 WI 134, ¶27, 359 Wis. 2d 421, 857 N.W.2d 120. A reviewing court determines whether exigent circumstances justify a warrantless blood draw under the same two-step inquiry. *State v. Howes*, 2017 WI 18, ¶¶17-19, 373 Wis. 2d 468, 893 N.W.2d 812.

¶16 When law enforcement collects a blood sample for chemical testing, it has conducted a "search" governed by the Fourth Amendment of the United States Constitution. *Schmerber v. California*, 384 U.S. 757, 767 (1966). The Fourth Amendment guarantees the "right of the people to be secure in their

6

persons … against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV. Warrantless searches are presumptively unreasonable unless an exception to the warrant requirement applies. *Tullberg*, 359 Wis. 2d 421, ¶30. One exception to the warrant requirement is the exigent circumstances doctrine, which allows warrantless searches "to prevent the imminent destruction of evidence." *Missouri v. McNeely*, 569 U.S. 141, 149 (2013).

¶17    Whether exigent circumstances justify a blood draw is an objective determination based on what the officer knew at the time. *Tullberg*, 359 Wis. 2d 421, ¶41. What an officer knew at the time is looked at from the prospective of a reasonable officer at the scene.

> [B]ecause the police are presumably familiar with the mechanics and time involved in the warrant process in their particular jurisdiction, we expect that officers can make reasonable judgments about whether the warrant process would produce unacceptable delay under the circumstances. Reviewing courts in turn should assess those judgments from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.

*McNeely*, 569 U.S. at 158, n.7 (citation omitted). Exigent circumstances depend on the reasonableness of an officer's belief that "the delay necessary to obtain a warrant, under the circumstances, threatened 'the destruction of evidence.'" *Schmerber*, 384 U.S. at 770 (citation omitted).

¶18    Two factors that heighten the exigency for a warrantless blood draw are a car accident involving the subject individual and his or her unconsciousness. The Supreme Court has concluded that a blood draw was justified by exigent circumstances because "a car accident heightened [the] urgency" that is "common to all drunk-driving cases." *Mitchell v. Wisconsin*, 588 U.S. ___, 139 S. Ct. 2525,

2533 (2019). Additionally, a driver's unconsciousness "almost always" heightens the urgency and constitutes an exigency. *Id.* at 2539.

¶19 Wiederin argues that the circuit court erred in concluding that her warrantless blood draw was justified by exigent circumstances. While she does not argue that law enforcement did not confront an emergency, she asserts that the officers had adequate time to obtain her consent or a warrant before her blood was drawn. She asserts that officers could have read her the Informing the Accused form at the crash scene, that the multiple officers at the scene had time to apply for a warrant, and that Sergeant Williams had time to apply for a warrant while en route to or after his arrival at the hospital.

¶20 Wiederin notes that there was no question that she was involved in the crash as she was pinned in her vehicle at the time officers arrived at the scene and witnesses identified her car as being involved. She asserts that law enforcement had probable cause to believe that she was under the influence "within five minutes of the accident," and therefore they did not require "additional time to investigate." In support, she points to her admission of drinking, an officer's observation of her slow and soft speech, and claims the officers located an open alcohol bottle in the vehicle.

¶21 While at the accident scene, Wiederin did admit to drinking, she could not tell Deputy Hillstead how much alcohol she had consumed, and she also denied using drugs. Hillstead testified that Wiederin "was talking softly. She obviously looked like she was in serious condition." Wiederin points to nothing in the record on appeal suggesting that Hillstead believed her soft speech was "indicative of drinking." Law enforcement did not identify the open container as alcohol nor the marijuana until Wiederin was removed from the vehicle and was on the way to the hospital.

¶22 Further, it was reasonable that law enforcement did not read the Informing the Accused form to Wiederin prior to her transport to the hospital. Law enforcement inquired about a blood sample; however, medical personnel refused so as not to delay transport due to the severity of Wiederin's injuries. Sergeant Charles Coleman testified that there were "about five or six" medics and first responders inside the ambulance with Wiederin, so the officers stayed out of the way because Wiederin's medical treatment was the top priority. As the circuit court properly recognized, the decision by emergency personnel not to allow officers to access Wiederin while she was in the ambulance "demonstrates the seriousness of Ms. Wiederin's condition and the exigent need to move her to a trauma hospital in Minnesota."

¶23 Contrary to Wiederin's argument that law enforcement had time to obtain a warrant after Wiederin left the scene and was transported to the hospital, the evidence shows that law enforcement did not have the opportunity to seek a warrant at that time. As the circuit court correctly determined, "[e]xigent circumstances existed throughout the night." The court found that the crash occurred "on a busy, divided highway," multiple law enforcement agencies were involved, and the crash scene was "chaotic." Additionally, the court found that two Village of Somerset police officers "divided and monitored traffic to protect the scene and the public," while "firefighters and EMTs were busy attending to the vehicle occupants." Further, the court found that Sergeant Coleman collected evidence to reconstruct the scene, and he called in an off-duty deputy to come to the scene for assistance. The court found that Coleman "worked continuously for 3 ½ to 4 hours" and that "Deputies [sic] Williams and Hillstead collected and preserved evidence before it was tainted or lost due to the passage of time or contamination of the scene."

9

¶24 Additionally, Sergeant Williams "also supervised the investigation, fielded other emergency calls throughout the county, and sought assistance from other agencies." At some point, Williams went to the hospital in St. Paul where Wiederin had been transported. The circuit court concluded that "[a]lthough six officers were on scene at different points in time, they were all consumed with necessary, time-sensitive tasks that could not be abandoned in favor of applying for a search warrant."

¶25 Wiederin appears to argue that law enforcement should have placed the importance of obtaining a warrant above all other duties at the scene. Wiederin, however, cites no authority requiring officers to direct all of their attention to first obtaining a blood draw and warrant before they undertake other responsibilities. As the supreme court recognized in *State v. Dalton*, 2018 WI 85, ¶50, 383 Wis. 2d 147, 914 N.W.2d 120, "[p]olice serve a dual purpose at an accident scene. They are present to investigate the cause of the accident and gather evidence of wrongdoing, but they are also there as first responders to injuries." *Id.* Just like in *Dalton*, the circuit court properly found that the officers at the scene acted reasonably in prioritizing pressing needs and duties over applying for a search warrant.

¶26 Wiederin next claims that Sergeant Williams should have applied for a warrant either en route to the hospital or while he waited at the hospital. Wiederin argues that Williams was "in the exact situation described in *McNeely*," where the Supreme Court noted that "an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer." *See McNeely*, 569 U.S. at 153. The situation here, however, is distinguishable from that contemplated in *McNeely*, which relied upon the example of an officer who was not driving a vehicle as having an opportunity to draft a warrant application while another officer drove both to the hospital. *Id.* at 153-54.

¶27     Here, Williams could not draft a warrant, as he was driving himself to the hospital.  Further, while Williams was not required to seek Wiederin's consent to a blood draw before applying for a warrant, the issue is whether he acted reasonably in trying to do so rather than first seeking a warrant.  The record supports the circuit court's finding that Williams acted reasonably and we agree.

¶28     When Sergeant Williams arrived at the hospital, he planned to seek Wiederin's consent to a blood draw and apply for a warrant if consent was denied.  Once Williams arrived at the hospital, however, he discerned that this approach would not be possible.  Williams learned that the medical personnel would not draw Wiederin's blood while she was in imaging, but they could do the blood draw once she was out of imaging.  Williams was later told that once Wiederin was out of imaging, she would be taken immediately to surgery, and medical personnel would not draw her blood for police purposes while in surgery.

¶29     As the circuit court recognized, had Sergeant Williams not been present at the hospital while Wiederin was in imaging, had he not made contact with a nurse at the right time, and had he not been present immediately before Wiederin went into surgery, he would not have been able to obtain a blood draw.  As the court stated, "[o]nly with the benefit of hindsight can one see that Deputy [sic] Williams waited an hour."  Williams did not know he would be waiting for an hour—he only knew that medical personnel would not let him speak to Wiederin while she was in imaging, so he needed to wait until that concluded.  And while Williams knew that under normal circumstances in Wisconsin it would take thirty minutes to obtain a warrant, Williams did not know how long it would take to do so in Minnesota.  The court further recognized that taking time to apply for a warrant could have had "terrible collateral costs" and that "[a]ny of these tasks easily would have diverted Deputy Williams' attention away from Ms. Wiederin at the expense of missing the

11

brief opportunity to see her before she went into surgery," leaving her "beyond the reach of the law, presumably for hours."

¶30     Here, as the circuit court recognized, taking the time to apply for a warrant would have threatened the destruction of evidence because Sergeant Williams may not have been present at the time evidence could be gathered. An officer is not required to obtain a warrant when doing so would threaten the destruction of the evidence. *McNeely*, 569 U.S. at 150; *Schmerber*, 384 U.S. at 770. Williams acted reasonably in first seeking Wiederin's consent for a blood sample, and when she was unconscious or otherwise unable to consent or refuse the draw, Williams acted reasonably by requesting hospital staff to draw her blood without a warrant, given the exigent circumstances that existed at that time. Accordingly, we affirm.

> *By the Court.*—Judgment affirmed.

> Not recommended for publication in the official reports.