# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2012AP523-CR |
| COMPLETE TITLE: | State of Wisconsin, |
| |         Plaintiff-Respondent, |
| |   v. |
| | Alvernest Floyd Kennedy, |
| |         Defendant-Appellant-Petitioner. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
(Reported at 348 Wis. 2d 263, 831 N.W.2d 824)
(Ct. App. - Unpublished)

| | |
|---|---|
| OPINION FILED: | December 26, 2014 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | September 9, 2014 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Milwaukee |
|   JUDGE: | Jeffrey A. Wagner |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | ABRAHAMSON, C.J., concurs. (Opinion filed.) |
|   DISSENTED: | |
|   NOT PARTICIPATING: | |

ATTORNEYS:

    For the defendant-appellant-petitioner, there were briefs by *Marcus J. Berghahn* and *Hurley, Burish & Stanton, S.C.*, Madison, and oral argument by *Marcus J. Berghahn*.

    For the plaintiff-respondent, the cause was argued by *Thomas J. Balistreri*, assistant attorney general, with whom on the brief was *J.B. Van Hollen*, attorney general.

**2014 WI 132**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2012AP523-CR
(L.C. No. 2006CF4053)

STATE OF WISCONSIN          :        IN SUPREME COURT

State of Wisconsin,

    Plaintiff-Respondent,

    v.

Alvernest Floyd Kennedy,

    Defendant-Appellant-Petitioner.

**FILED**

**DEC 26, 2014**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed.*

¶1 MICHAEL J. GABLEMAN, J. This is a review of an unpublished decision of the court of appeals[1] affirming the circuit court's entry of a judgment of conviction following the jury trial of Alvernest Floyd Kennedy ("Kennedy").[2] The Milwaukee County District Attorney's Office charged Kennedy with homicide by intoxicated use of a motor vehicle in violation of

---

[1] *State v. Kennedy*, No. 2012AP523-CR, unpublished slip op. (Wis. Ct. App. Apr. 9, 2013).

[2] The Honorable Jeffrey A. Wagner, presiding.

Wisconsin Statutes § 940.09(1)(a),[3] and homicide by operation of a motor vehicle with a prohibited alcohol concentration in violation of § 940.09(1)(b).[4] At trial, the jury found Kennedy guilty of homicide by intoxicated use of a motor vehicle.[5]

¶2 The following issues are presented for our review: 1) whether the police had probable cause to arrest Kennedy for operating a motor vehicle while intoxicated ("OWI"); 2) whether the United States Supreme Court's ruling in Missouri v. McNeely, 569 U.S. __, 133 S. Ct. 1552 (2013), renders unconstitutional the warrantless investigatory blood draw performed on Kennedy;

---

[3] All subsequent references to the Wisconsin Statutes are to the 2005-06 version unless otherwise indicated. Wisconsin Stat. § 940.09(1)(a) provides:

> Any person who does any of the following may be penalized as provided in sub. (1c):
>
> (a) Causes the death of another by the operation or handling of a vehicle while under the influence of an intoxicant.

[4] Wisconsin Stat. § 940.09(1)(b) provides:

> Any person who does any of the following may be penalized as provided in sub. (1c):
>
> . . .
>
> (b) Causes the death of another by the operation or handling of a vehicle while the person has a prohibited alcohol concentration, as defined in s. 340.01 (46m).

[5] While the jury also found Kennedy guilty of the companion violation of homicide by operation of a motor vehicle with a prohibited alcohol concentration, in accordance with Wis. Stat. § 346.63(1)(c) that charge was dismissed on the State's motion.

2

and 3) if McNeely renders the warrantless investigatory blood draw unconstitutional, whether the good-faith exception to the exclusionary rule applies.

¶3 We conclude that the police had probable cause to believe that Kennedy had committed a drunk-driving related crime or offense. Therefore, Kennedy's arrest was lawful.

¶4 Following our interpretation of the United States Supreme Court's decision in Schmerber v. California, 384 U.S. 757 (1966), we held that the natural dissipation of alcohol in the bloodstream of a suspect created a sufficient exigency so as to justify a warrantless investigatory blood draw. State v. Bohling, 173 Wis. 2d 529, 547, 494 N.W.2d 399 (1993). The police in this case acted in accordance with our holding in Bohling when they ordered the warrantless investigatory blood draw performed on Kennedy.

¶5 During the pendency of this case, however, the United States Supreme Court abrogated our holding in Bohling. McNeely, 133 S. Ct. 1552. In light of that abrogation, we accept, as we must, McNeely's totality of the circumstances test for the purpose of determining whether exigent circumstances are present so as to justify warrantless investigatory blood draws in cases involving "drunk-driving related violation[s] or crime[s]."

¶6 The State has not argued that exigent circumstances exist so as to justify the warrantless investigatory blood draw performed on Kennedy. Because the State does not argue that exigent circumstances existed, we assume, without deciding, that the warrantless investigatory blood draw performed on Kennedy

was not supported by exigent circumstances. However, we conclude that the police acted in objectively reasonable accord with the clear and settled Wisconsin precedent existing at the time the warrantless investigatory blood draw was performed on Kennedy. Therefore, the good-faith exception applies and we affirm the court of appeals and uphold Kennedy's conviction.

## I. FACTS AND PROCEDURAL HISTORY

¶7 On August 3, 2006, shortly after midnight, Kennedy, the driver of a 1966 Chevy Impala, struck the victim as she crossed the street on West Fond du Lac Avenue in Milwaukee. Milwaukee police officers Marcey Asselin and Jeffrey Hoffman were the first on the scene at 12:15 a.m., less than a minute after the collision. Upon arrival, Officer Asselin observed the 1966 Chevy Impala facing westbound in the eastbound lane with the severely injured victim pinned underneath the passenger side of the vehicle and skid marks approximately one block long leading to the vehicle.

¶8 Officer Asselin asked bystanders at the scene if anyone knew the identity of the driver of the Impala. In response, Kennedy admitted to Officer Asselin that he was the driver. Officer Asselin then told him to wait on the sidewalk while she tended to the victim. Paramedics placed the victim in an ambulance at approximately 12:30 a.m., at which point Officer Asselin returned to talk with Kennedy and his passenger, Anthony Jones.

¶9 When Officer Asselin approached Kennedy in order to obtain his statement, she observed that Kennedy's eyes were

4

glassy and bloodshot, he was swaying back and forth, his speech was slow and slurred, and a strong odor of alcohol was on his breath.   These observations, combined with the severity of the accident, led Officer Asselin to conclude that Kennedy was intoxicated.   Officer Asselin did not ask Kennedy to perform any field sobriety tests.

¶10  During Officer Asselin's conversation with Kennedy, a crowd of approximately 30 to 40 people had gathered at the scene and began "yelling and screaming," and some attempted to improperly cross the police tape.   Because of this unrest and the possible jeopardy to Kennedy's safety, Officer Asselin and Sergeant Roberto Hill asked Kennedy to sit in one of the squad cars.   Kennedy initially refused, but at 12:45 a.m. relented and voluntarily walked to one of the squad cars.   At this time, the officers did not inform Kennedy that he was under arrest nor was he physically restrained.   Shortly thereafter, at 12:50 a.m., Officer Asselin learned the victim had died as a result of the injuries she sustained from the impact of Kennedy's vehicle.

¶11  At 1:00 a.m., Officer Asselin received information that a witness saw two cars, one of which was Kennedy's Impala, traveling at a high rate of speed[6] just before the accident.   The witness stated that the victim was crossing the street when she was hit by Kennedy's Impala.

---

[6] The record varies on the speed of the 2 cars, but the range was between 50 and 80 miles per hour.

¶12 Milwaukee police detective Paul Formolo arrived at the scene at 1:51 a.m., at which time officers on the scene informed him they suspected Kennedy of OWI. Detective Formolo entered the squad car in which Kennedy was seated and immediately noticed a strong odor of alcohol. After a brief conversation with Kennedy, Detective Formolo placed him under arrest at 2:05 a.m. and instructed one of the officers on the scene to transport Kennedy to a nearby hospital for an investigatory blood draw. Hospital personnel conducted the investigatory blood draw at 3:18 a.m. No warrant had been sought for the blood draw and none had been issued. The results of the blood draw showed Kennedy's blood-alcohol level was .216 (nearly three times the legal limit) at the time of the draw.

¶13 The Milwaukee County District Attorney's Office charged Kennedy with homicide by intoxicated use of a motor vehicle and homicide by operation of a motor vehicle with a prohibited alcohol concentration. Kennedy moved the circuit court to suppress the results of the warrantless investigatory blood draw, arguing that the police lacked probable cause for his arrest. The circuit court denied Kennedy's motion. A trial was held and the jury found Kennedy guilty of both counts. The circuit court entered a judgment of conviction for homicide by intoxicated use of a motor vehicle and dismissed the second count on the State's motion.

¶14 Kennedy appealed, and in an unpublished opinion the court of appeals affirmed Kennedy's conviction. Eight days after the court of appeals issued its decision the United States

Supreme Court released its decision in Missouri v. McNeely.  The Supreme Court held in McNeely that the dissipation of alcohol in the bloodstream by itself does not create a per se exigency so as to justify a warrantless investigatory blood draw of an OWI suspect.  McNeely, 133 S. Ct. at 1563.  Thus, McNeely abrogated this court's holding in State v. Bohling.

¶15 Kennedy petitioned this court for review, which we granted on February 19, 2014.

## II.  STANDARD OF REVIEW

¶16  This case presents questions of constitutional fact. On review, "we accept the circuit court's findings of fact unless they are clearly erroneous." State v. Dearborn, 2010 WI 84, ¶13, 327 Wis. 2d 252, 786 N.W.2d 97.  The application of those facts to constitutional principles is a question of law that we review de novo.  Id.

## III. DISCUSSION

A.   The Police Had Probable Cause to Arrest Kennedy at the Time He Went to the Squad Car.

¶17 Kennedy argues that the police lacked probable cause to arrest him for OWI, so that the subsequent warrantless investigatory blood draw was unlawful.  Thus, the initial question in this case is whether Kennedy's arrest was lawful.  A warrantless investigatory blood draw is lawful so long as exigent circumstances exist and:

> (1) the blood draw is taken to obtain evidence of intoxication from a person lawfully arrested for a drunk-driving related violation or crime, (2) there is a clear indication that the blood draw will produce

> evidence of intoxication, (3) the method used to take the blood sample is a reasonable one and performed in a reasonable manner, and (4) the arrestee presents no reasonable objection to the blood draw.

Bohling, 173 Wis. 2d at 534 (footnote omitted). This four-factor test is rooted in Schmerber and was not overruled by McNeely. See Schmerber, 384 U.S. at 769-71; McNeely, 133 S. Ct. at 1560. In a footnote to this test, we explained that probable cause to arrest for a drunk-driving related violation or crime "substitutes for the predicate act of lawful arrest" under the first factor. Bohling, 173 Wis. 2d at 534 n.1 (citing State v. Bentley, 92 Wis. 2d 860, 863-64, 286 N.W.2d 153 (Ct. App. 1979)). The second factor, whether there is a "clear indication that the blood draw will produce evidence of intoxication," in this case is also satisfied by the same facts that support a finding of probable cause to arrest. See Schmerber, 384 U.S. at 770 (noting that "the facts which established probable cause to arrest in this case also suggested the required relevance and likely success of a test of petitioner's blood for alcohol"); State v. Erickson, 2003 WI App 43, ¶12, 260 Wis. 2d 279, 659 N.W.2d 407 (noting that "in the absence of an arrest, probable cause to believe blood currently contains evidence of a drunk-driving related violation or crime" necessarily satisfies the first and second prongs of Bohling).

¶18 We note that probable cause to arrest for a drunk-driving related violation or crime is not the only avenue to a lawful warrantless investigatory blood draw. Rather where law enforcement officers have probable cause to search a suspect's

8

blood for evidence of a drunk-driving related violation or crime, they will necessarily satisfy the first two <u>Bohling</u> factors.[7] <u>Erickson</u>, 260 Wis. 2d 279, ¶12.[8] Because Kennedy challenges whether his arrest was supported by probable cause, we proceed under that analytical framework. However, in the absence of an arrest, probable cause to search the suspect's blood, along with exigent circumstances, is sufficient to satisfy <u>Schmerber</u> and <u>McNeely</u>. See <u>Erickson</u>, 260 Wis. 2d 279, ¶¶12-16.

¶19 Kennedy argues he was under arrest at the time he was placed in the squad car. Further, he argues the police did not have probable cause to arrest him for OWI at that time. Kennedy claims that under the circumstances, he was not free to leave and, even though not formally under arrest, he was under de facto arrest. In contrast, the State argues, and the court of

---

[7] While probable cause to search for evidence of a drunk-driving related violation or crime is sufficient to satisfy the first two factors of <u>Bohling</u>, the converse is not necessarily true. The fact of an arrest, or probable cause to arrest, for a drunk-driving related violation or crime <u>alone</u> will not permit an investigatory blood draw. Rather, there must also be a clear indication that the blood draw will produce evidence of intoxication. <u>State v. Erickson</u>, 2003 WI App 43, ¶8, 260 Wis. 2d 279, 659 N.W.2d 407 (noting that "police sometimes come into possession of information supporting an arrest long after the intoxicated operation and at a time when there is no longer reason to think the driver's blood contains alcohol.").

[8] Kennedy does not argue that the warrantless investigatory blood draw was performed in an unreasonable manner or that he had a reasonable objection to it and we do not address these issues.

9

appeals determined, Kennedy was not under arrest until Detective Formolo arrived at the scene and placed Kennedy under formal arrest. The State and court of appeals concluded that at this time the police officers on the scene had sufficient evidence to support a finding of probable cause to arrest Kennedy for a drunk-driving related violation or crime.

¶20 While the parties spend a great deal of time in their briefs on the issue of when Kennedy was placed under arrest, we need not decide that issue because the police had probable cause to arrest Kennedy for a drunk-driving related violation or crime when he was placed in the rear of the squad car. We therefore assume, without deciding, that Kennedy was under arrest when placed in the squad car, and hold that at that time the police had probable cause to arrest him for a drunk-driving related violation or crime.

¶21 Kennedy argues that the physical indications of intoxication observed by the officers (i.e., his bloodshot and glassy eyes, slurred speech, swaying, and the strong odor of alcohol on his breath) were insufficient to establish probable cause to believe Kennedy probably committed a drunk-driving related violation or crime. He makes this argument based on his understanding that field sobriety tests are a prerequisite to a finding of probable cause. Kennedy's understanding is mistaken. Wisconsin has no requirement that police must perform field sobriety tests in order to determine whether probable cause exists that a person is operating a vehicle under the influence of alcohol. See State v. Lange, 2009 WI 49, ¶43, 317

10

Wis. 2d 383, 766 N.W.2d 551 (Ziegler, J. concurring). "Probable cause exists where the totality of the circumstances within the arresting officer's knowledge at the time of the arrest would lead a reasonable police officer to believe that the defendant probably committed a crime." State v. Koch, 175 Wis. 2d 684, 701, 499 N.W.2d 152 (1993). Further, "[i]t is not necessary that the evidence giving rise to such probable cause be sufficient to prove guilt beyond a reasonable doubt, nor must it be sufficient to prove that guilt is more probable than not." Id. (quoting State v. Paszek, 50 Wis. 2d 619, 624-25, 184 N.W.2d 836 (1971)).

¶22 In the context of an arrest for a drunk-driving related violation or crime, a law enforcement officer may consider numerous factors in order to determine probable cause to arrest. Probable cause may be established through a showing of erratic driving and the subsequent "stumbling" of the driver after getting out of the motor vehicle. See State v. Welsh, 108 Wis. 2d 319, 333-35, 321 N.W.2d 245 (1982) overruled on other grounds, Welsh v. Wisconsin, 466 U.S. 740 (1984). In other cases, factors sufficient to support a finding of probable cause have included bloodshot eyes, an odor of intoxicants, and slurred speech, together with a motor vehicle accident or erratic driving. See State v. Wille, 185 Wis. 2d 673, 683, 518 N.W.2d 325 (Ct. App. 1994) (holding that the officers' observation of an odor of intoxicants, the nature of the accident, and the defendant's statement that he had "to quit doing this," supported probable cause); State v. Babbitt, 188

11

Wis. 2d 349, 357, 525 N.W.2d 102 (Ct. App. 1994) (holding that the officer's observation of erratic driving and physical indications of intoxication supported probable cause); State v. Kasian, 207 Wis. 2d 611, 622, 558 N.W.2d 687 (Ct. App. 1996) (holding that the nature of the single-vehicle accident, odor of intoxicants, and slurred speech supported probable cause). These cases illustrate that "[p]robable cause is a 'flexible, common-sense measure of the plausibility of particular conclusions about human behavior.'" Lange, 317 Wis. 2d 383, ¶20 (quoting State v. Higginbotham, 162 Wis. 2d 978, 989, 471 N.W.2d 24 (1991)).

¶23 Here, the facts known to Officer Asselin are undeniably sufficient to support a finding of probable cause that Kennedy committed a drunk-driving related violation or crime. Upon arrival at the scene, Officer Asselin observed block-long skid marks leading to Kennedy's Impala which faced the opposite direction of traffic. Officer Asselin further observed the results of the high speed impact between Kennedy's vehicle and the victim. After identifying Kennedy as the driver, Officer Asselin observed that Kennedy's eyes were bloodshot and glassy, he was slurring his speech, he was swaying, and he smelled of alcohol. Combined, these facts would lead a reasonable police officer to believe that Kennedy probably committed a drunk-driving related violation or crime.

¶24 In light of the foregoing, we hold that "the totality of the circumstances within the arresting officer's knowledge at the time of the arrest would lead a reasonable police officer to

12

believe that the defendant probably committed a crime;" specifically, a drunk-driving related violation or crime. Koch, 175 Wis. 2d at 701. Consistent with our discussion of Schmerber and Bohling we also hold that these same facts and circumstances provided probable cause to search Kennedy's blood. See Erickson, 260 Wis. 2d 279, ¶12.

### B. Wisconsin Law and McNeely

¶25 Having addressed the threshold issue of whether Kennedy's arrest was lawful, we turn now to the next issue before us: whether Kennedy's Fourth Amendment[9] right to be free from unreasonable searches and seizures was violated. At the time of Kennedy's arrest, Wisconsin law regarding "drunk-driving related violation[s] or crime[s]" stated "the dissipation of alcohol from a person's bloodstream constitutes a sufficient exigency to justify a warrantless [investigatory] blood draw." Bohling, 173 Wis. 2d at 547. In Bohling, we considered warrantless investigatory blood draws in light of the United States Supreme Court's opinion in Schmerber v. California. In

---

[9] The Fourth Amendment to the United States Constitution provides:

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

13

Schmerber, the Court held that seizing a suspect's blood for evidentiary purposes was different than other searches and seizures subsequent to a lawful arrest because "[t]he interests in human dignity and privacy which the Fourth Amendment protects forbid any such [bodily] intrusions on the mere chance that desired evidence might be obtained." Schmerber, 384 U.S. at 769-70. Thus, the Court required "a clear indication" that evidence of intoxication will be found through a blood draw. Id. Schmerber concluded that, under the circumstances of that case, the blood draw performed was reasonable and did not violate the Fourth Amendment. Id. at 772.

¶26 The Court used three important factors to reach its conclusion that Schmerber's blood draw was reasonable. First, the same facts that showed probable cause to indicate the defendant operated a motor vehicle under the influence of alcohol also showed "likely success" in finding further evidence by testing the defendant's blood. Id. at 770. Second, due to the rapid, natural dissipation of alcohol in the defendant's bloodstream, the officer "might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence." Id. (internal quotations omitted). Third, the Court concluded that the method chosen to draw and test the defendant's blood, and the means by which the test was performed, were reasonable. Id. at 771.

¶27 In Bohling, we stated that Schmerber could

14

be read in either of two ways: (a) that the rapid dissipation of alcohol in the bloodstream alone constitutes a sufficient exigency for a warrantless blood draw to obtain evidence of intoxication following a lawful arrest for a drunk driving related violation or crime——as opposed to taking a blood sample for other reasons, such as to determine blood type; or (b) that the rapid dissipation of alcohol in the bloodstream, coupled with an accident, hospitalization, and the lapse of two hours until arrest, constitute exigent circumstances for such a blood draw.

Bohling, 173 Wis. 2d at 539 (emphasis added). We concluded that following a lawful arrest for a drunk-driving related violation or crime the "more reasonable" reading of Schmerber was the former: that the "rapid dissipation of alcohol" alone constitutes the kind of exigency necessary to permit a warrantless investigatory blood draw from the suspect. Id. We reached this conclusion based on "a logical analysis" of Schmerber, that the exigency presented was the fact that, as time passed, the critical evidence of alcohol in the bloodstream was rapidly being destroyed. Id. at 539-40. In other words, we construed Schmerber to hold that the sole exigency in that case was the destruction of critical evidence: the alcohol in the defendant's blood.

¶28 As a result of this construction, we held that a warrantless investigatory blood draw, conducted at the direction of a law enforcement officer, was lawful so long as:

(1) the blood draw is taken to obtain evidence of intoxication from a person lawfully arrested for a drunk-driving related violation or crime, (2) there is a clear indication that the blood draw will produce evidence of intoxication, (3) the method used to take the blood sample is a reasonable one and performed in

15

a reasonable manner, and (4) the arrestee presents no reasonable objection to the blood draw.

Id. at 534 (footnote omitted).[10] Each of these factors is rooted in Schmerber. See Schmerber, 384 U.S. at 769-771. Bohling interpreted Schmerber to mean that the natural dissipation of alcohol in a defendant's bloodstream was per se an "exigent circumstance." That interpretation remained the law in Wisconsin for 20 years.[11]

¶29 However, in 2013, the United States Supreme Court issued its decision in McNeely, effectively abrogating our holding in Bohling that the rapid dissipation of alcohol alone constitutes an exigent circumstance sufficient for law enforcement officers to order a warrantless investigatory blood draw. In McNeely, the Court considered an appeal in which the State of Missouri argued for the creation of a per se rule nearly identical to our holding in Bohling. McNeely, 133 S. Ct. at 1556. The Missouri Supreme Court held "Schmerber directs lower courts to engage in a totality of the circumstances analysis when determining whether exigency permits a nonconsensual, warrantless blood draw." Id. at 1557. The United States Supreme Court "granted certiorari to resolve a split of authority on the question whether the natural

_____

[10] As explained above, probable cause to arrest "substitutes for the predicate act of lawful arrest." State v. Bohling, 173 Wis. 2d 529, 534 n.1, 494 N.W.2d 399 (1993) (citation omitted). This portion of our holding is not affected by McNeely.

[11] We decided Bohling on January 26, 1993, and the Supreme Court decided McNeely on April 17, 2013.

16

dissipation of alcohol in the bloodstream establishes a per se exigency that suffices on its own to justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations." Id. at 1558. The Court held that the Fourth Amendment does not allow such per se rules in the context of warrantless investigatory blood draws. Id. at 1561 (stating that a per se rule would be a "considerable overgeneralization" of Schmerber). The Court in McNeely clarified its decision in Schmerber and explained that, while the natural dissipation of alcohol in the defendant's bloodstream was a significant factor in its analysis, it was not dispositive. Id. Thus, because an investigatory blood draw "implicates an individual's most personal and deep-rooted expectations of privacy," in the absence of exigent circumstances, a warrant is required in order to perform an investigatory blood draw. Id. at 1558 (internal quotations omitted).

¶30 The Court noted that advancements in technology since Schmerber have greatly reduced the time and effort needed to secure a warrant before an investigatory blood draw is performed, resulting in more time for law enforcement officials to obtain a warrant. Id. at 1562. McNeely did, however, acknowledge that such improvements do not guarantee that a judge or magistrate will be available to approve a warrant in all situations. Id. McNeely further suggested that such improvements do not eliminate the possibility that circumstances may make it impractical for law enforcement to even attempt to

17

obtain a warrant. Id. at 1568. While a "variety of circumstances may give rise to an exigency sufficient to justify a warrantless search," in each circumstance the exigency will be "a compelling need for official action and no time to secure a warrant." Id. at 1558-59 (citations omitted). Nevertheless, where law enforcement officers can "reasonably obtain a warrant before a blood sample can be drawn . . . the Fourth Amendment mandates that they do so." Id. at 1561 (emphasis added).

¶31 McNeely recognized the difficulty such a requirement creates for law enforcement, and explained that "exigent circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant application process." Id. at 1563. As a result, while the natural dissipation of alcohol in the bloodstream alone does not create an exigent circumstance, it may serve to support a finding of exigency. Id. Thus, the Court was clear that law enforcement must procure a warrant when it is reasonable to do so under the facts and circumstances of the situation. However, law enforcement is not required to obtain a warrant when there is "a compelling need for official action and no time to secure a warrant." Id. at 1559, 1561.

¶32 In light of the Supreme Court's decision in McNeely, we recognize our holding in Bohling, that the rapid dissipation of alcohol alone constitutes an exigent circumstance sufficient for law enforcement officers to order a warrantless investigatory blood draw, is no longer an accurate interpretation of the Fourth Amendment's protection against

18

unreasonable searches and seizures.  Accordingly, we hold that the rapid dissipation of alcohol alone no longer constitutes a per se exigent circumstance.  Exigent circumstances, sufficient to justify a warrantless investigatory blood draw of a drunk-driving suspect, are to be determined on a case-by-case totality of the circumstances analysis.

> 1.  <u>McNeely</u> Applies to Kennedy's Case.

¶33  Following the Supreme Court's decision in <u>McNeely</u>, it is also necessary to determine whether its holding applies retroactively to Kennedy's case.  We recently discussed the principle of retroactivity in <u>State v. Dearborn</u>.  In <u>Dearborn</u>, we explained that "newly declared constitutional rules must apply to all similar cases pending on direct review." <u>Dearborn</u>, 327 Wis. 2d 252, ¶31 (citations omitted).  As Kennedy's direct appeal was not yet final[12] when the Supreme Court issued its decision in <u>McNeely</u>, its holding applies and the State may not rely <u>solely</u> on the natural dissipation of alcohol to justify the warrantless investigatory blood draw performed on Kennedy.  Thus, even if the police officers acted in accordance with clear and settled Wisconsin precedent at the time they ordered the warrantless investigatory blood draw, we must nevertheless analyze their conduct in light of <u>McNeely</u>.  If the warrantless

---

[12] In the context of retroactivity, "final" means "a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied." <u>Griffith v. Kentucky</u>, 479 U.S. 314, 321 n.6 (1987).

19

investigatory blood draw was unconstitutional under McNeely, we must then consider whether the exclusionary rule applies.

2. The State Does Not Argue that the Warrantless Investigatory Blood Draw Performed on Kennedy was Constitutional.

¶34 In order to determine whether the warrantless investigatory blood draw performed on Kennedy was constitutional we look to whether, under the totality of the circumstances, the police officers could reasonably have obtained a warrant before ordering an investigatory blood draw be performed on Kennedy. See McNeely, 133 S. Ct. at 1561. We note that it is the State that bears the burden of proving the existence of exigent circumstances sufficient to justify a warrantless investigatory blood draw. See State v. Robinson, 2010 WI 80, ¶24, 327 Wis. 2d 302, 786 N.W.2d 463. Under McNeely, the Supreme Court left open the possibility that exigent circumstances could exist even in "an ordinary traffic stop" due to the "procedures in place for obtaining a warrant or the availability of a magistrate judge," among other factors. McNeely, 133 S. Ct. at 1568. However, the State has not attempted to meet its burden in this case. In light of the State's concession, we find it difficult to address whether exigent circumstances did or did not exist, because we are deprived of arguments by either the State or Kennedy. As a result, we will assume, without

deciding, that exigent circumstances did not support the blood draw performed on Kennedy.[13]

    3.    The Police Officers Acted in Accordance with Clear and Settled Precedent and Thus, the Good-Faith Exception to the Exclusionary Rule Applies.

¶35 In ordering the warrantless investigatory blood draw on Kennedy the police followed our clear and settled precedent in Bohling. Accordingly, we analyze whether the good-faith exception to the exclusionary rule applies.

¶36 "[S]ince its inception, the exclusionary rule has been a remedy, not a right." State v. Eason, 2001 WI 98, ¶48, 245 Wis. 2d 206, 629 N.W.2d 625. The main purpose of the exclusionary rule is to deter police misconduct and "necessarily assumes that the police have engaged in willful or, at the very least, negligent conduct which has deprived a defendant of a constitutional right." Id., ¶45 (quoting State v. Gums, 69 Wis. 2d 513, 517, 230 N.W.2d 813 (1975)). Moreover, application of the exclusionary rule "is not absolute, but requires a

---

[13] The State, which would bear the burden, does not argue that exigent circumstances existed in this case. Neither the State nor Kennedy focus on this issue. Whether an exigency exists in a given case will vary depending on any number of facts or circumstances, as law enforcement investigations are often extraordinarily fluid situations. Our holding in this case must not be read to affirmatively conclude that exigent circumstances did not support the warrantless investigatory blood draw performed on Kennedy. Nonetheless, our analysis remains focused on the arguments addressed by counsel and ultimately rests upon an application of the good-faith exception.

weighing of the pertinent interests." Id., ¶43. Thus, the exclusionary rule applies "most appropriately when the deterrent benefits outweigh the substantial costs to the truth-seeking and law enforcement objectives of the criminal justice system." Dearborn, 327 Wis. 2d 252, ¶38. As such, "the exclusionary rule should not apply when the police act in good faith, or in 'objectively reasonable reliance' on a subsequently invalidated search warrant." Id., ¶36 (citing Herring v. United States, 555 U.S. 135, 142 (2009)); see also Eason, 245 Wis. 2d 206, ¶74. Further, police conduct must be "sufficiently deliberate that exclusion can meaningfully deter it." Dearborn, 327 Wis. 2d 252, ¶36 (citing Herring, 555 U.S. at 144).

¶37 Here, the police committed no misconduct and application of the exclusionary rule would be both inappropriate and unnecessary as the police acted in accordance with clear and settled Wisconsin precedent in ordering the warrantless investigatory blood draw. "[T]he good-faith exception precludes application of the exclusionary rule where officers conduct a search [or seizure] in objectively reasonable reliance upon clear and settled Wisconsin precedent that is later deemed unconstitutional by the United States Supreme Court." Id., ¶51. As we explained above, our decision in Bohling was the settled law in Wisconsin for the two decades preceding the decision in McNeely. Our holding in Bohling was clear and straightforward: "the dissipation of alcohol from a person's bloodstream constitutes a sufficient exigency to justify a warrantless blood draw." Bohling, 173 Wis. 2d at 547. Officer Asselin and the

22

other police officers involved in this case followed that rule. To apply the exclusionary rule here would be counter to the purposes for which it was created.  Where police officers have acted in accordance with clear and settled Wisconsin precedent, there is no misconduct to deter.  <u>Dearborn</u>, 327 Wis. 2d 252, ¶44.  We see no reason to depart from <u>Dearborn</u> and our application of the good-faith exception to the exclusionary rule.  As a result, the officers' reliance on <u>Bohling</u> was reasonable and the results of Kennedy's warrantless blood draw will not be suppressed.

## IV.  CONCLUSION

¶38 We conclude that the police had probable cause to believe that Kennedy had committed a drunk-driving related crime or offense.  Therefore, Kennedy's arrest was lawful.

¶39 Following our interpretation of the United States Supreme Court's decision in <u>Schmerber v. California</u>, we held that the natural dissipation of alcohol in the bloodstream of a suspect created a sufficient exigency so as to justify a warrantless investigatory blood draw.  <u>Bohling</u>, 173 Wis. 2d at 547.  The police in this case acted in accordance with our holding in <u>Bohling</u> when they ordered the warrantless investigatory blood draw performed on Kennedy.

¶40 During the pendency of this case, however, the United States Supreme Court abrogated our holding in <u>Bohling</u>.  <u>McNeely</u>, 133 S. Ct. 1552.  In light of that abrogation, we accept, as we must, <u>McNeely</u>'s totality of the circumstances test for the purpose of determining whether exigent circumstances are present

23

so as to justify warrantless investigatory blood draws in cases involving "drunk-driving related violation[s] or crime[s]."

¶41 The State has not argued that exigent circumstances exist so as to justify the warrantless investigatory blood draw performed on Kennedy. Because the State does not argue that exigent circumstances existed, we assume, without deciding, that the warrantless investigatory blood draw performed on Kennedy was not supported by exigent circumstances. However, we conclude that the police acted in objectively reasonable accord with the clear and settled Wisconsin precedent existing at the time the warrantless investigatory blood draw was performed on Kennedy. Therefore, the good-faith exception applies and we affirm the court of appeals and uphold Kennedy's conviction.

*By the Court.*—The decision of the court of appeals is affirmed.

¶42 SHIRLEY S. ABRAHAMSON, C.J. *(concurring).* The instant case is part of a trilogy of cases examining the constitutionality of warrantless, nonconsensual blood draws performed on persons suspected of driving under the influence of an intoxicant in light of <u>Missouri v. McNeely</u>, 133 S. Ct. 1552 (2013). The other two cases in this trilogy are <u>State v. Tullberg</u>, 2014 WI 134, ___ Wis. 2d ___, ___ N.W.2d ___, and <u>State v. Foster</u>, 2014 WI 131, ___ Wis. 2d ___, ___ N.W.2d ___. For a discussion of these three opinions, including the instant case, and the issues arising therein, see my dissenting opinion in <u>State v. Foster</u>, 2014 WI 131, ___ Wis. 2d ___, ___N.W.2d ___.