ANN WALSH BRADLEY, J.
¶ 61. (dissenting). The primary issue addressed by the majority is whether Parisi's warrantless blood draw is an exigent circumstance justifying an exception to the warrant requirement. If it is not, then the warrantless blood draw was a violation of the Fourth Amendment of the United States Constitution and the evidence obtained must be suppressed.
¶ 62. All agree that absent an emergency, search warrants are required for intrusions into the human body. Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013) (citing Schmerber v. California, 384 U.S. 757, 770 (1966)).
¶ 63. Likewise, it is undisputed that pursuant to McNeely a per se rule authorizing warrantless blood *35 draws based on dissipation of evidence in the bloodstream is prohibited under the Fourth Amendment. See id. Nevertheless, the majority creates a per se rule by inventing a new best evidence rule for every heroin case, concluding that exigent circumstances exist due to the rapid speed at which heroin dissipates in the blood.
¶ 64. Not only does the majority opinion disregard McNeely's prohibition of a per se rule based on dissipation, it also ignores the circumstances under which McNeely directs that the police must always obtain a warrant. McNeely instructs that "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Id. at 1561.
¶ 65. Contrary to the majority, I conclude that the State has failed to show there were exigent circumstances justifying an exception to the warrant requirement. During the approximately two and one-half hours available, at least one of the five to seven officers involved in the investigation could have and should have obtained a warrant. The warrantless blood draw violated Parisi's Fourth Amendment rights and the evidence resulting from it should be suppressed.[1] Therefore, I respectfully dissent.
*36 I — I
f 66. The majority determines that the circuit court's finding of exigent circumstances based on "the dissipation of . . . heroin within the human body, and the speed in which it does that" were not clearly erroneous. Majority op. ¶ 38. According to the majority, "critical evidence of heroin use in Parisi's body was disappearing by the minute, and had been since an unknown time that evening." Majority op. f 41.
¶ 67. Repeatedly, the majority focuses on dissipation. See, e.g., majority op. ¶ 45 ("a two-hour delay would risk the destruction of evidence in this case because of, among other things, the rapid dissipation of heroin in the blood"); see also majority op. ¶ 48 ("waiting two hours to obtain a warrant would 'significantly undermin[e] the efficacy' of a blood draw by leading to ambiguous test results; evidence of heroin or morphine use, rather than heroin use alone, might result if sufficient time has passed"); majority op. f 50 ("the fact that morphine remains in the body for several hours after the ingestion of heroin does not mean that it would be unreasonable for Officer Fen-house to believe that taking the time to obtain a search warrant in this case risked destruction of evidence of heroin use").
¶ 68. In asserting that the rapid dissipation of heroin is an exigent circumstance, the majority relies on scientific literature provided by the State. See Elisabeth J. Rook et al., Pharmacokinetics and Phar-macokinetic Variability of Heroin and its Metabolites: *37 Review of the Literature, 1 Current Clinical Pharmacology 109, 111 (2006). Of particular import is the scientific evidence that "[h]eroin converts to its first metabolite, 6-[mono]acetylmorphine[,] within a few minutes. 6-[mono]acetylmorphine then converts to morphine. 6-[mono]acetylmorphine is detectable in plasma for 1-3 hours after heroin use." Majority op. ¶ 43. According to the majority, heroin or its first metabolite, 6-monoacetylmorphine, are the most probative evidence of heroin use and therefore the best evidence. Majority op. ¶ 46.
f 69. The majority concedes that morphine is evidence of heroin use that remains in the blood for hours after heroin and 6-monoacetylmorphine dissipate. See, e.g., majority op. ¶ 50. Nevertheless, it rejects this evidence as not being sufficiently probative.[2] Consequently, the majority creates a best evidence rule in heroin cases.
¶ 70. Oddly, the majority ends up arguing that the very evidence of morphine the State wishes to preserve in the suppression motion is really not good enough because it is less probative than heroin or 6-monoacetylmorphine. Majority op. ¶ 46. It contends, "Parisi might have a plausible defense to a charge based on heroin found in the residence and *38 morphine found in his blood, but no defense to a charge based on heroin found in the residence and heroin or 6-monoacetylmorphine found in his blood." Majority op. ¶ 46.
I — I
¶ 71. In our prior decisions, this court properly recognized that McNeely "changed the landscape of warrantless blood draws in Wisconsin." State v. Tallberg, 2014 WI 134, ¶ 42, 359 Wis. 2d 421, 857 N.W.2d 120; see also State v. Kennedy, 2014 WI 132, ¶ 29, 359 Wis. 2d 454, 856 N.W.2d 834 ("in 2013, the United States Supreme Court issued its decision in McNeely, effectively abrogating our holding in Bohling that the rapid dissipation of alcohol alone constitutes an exigent circumstance sufficient for law enforcement officers to order a warrantless investigatory blood draw.").[3] In Kennedy, this court concluded that under McNeely, "the Fourth Amendment does not allow such *39 per se rules in the context of warrantless investigatory blood draws." 359 Wis. 2d 454, ¶ 29 (citing McNeely, 133 S. Ct. at 1561).
¶ 72. Despite this court's prior adherence to Mc-Neely, the cornerstone of the majority's opinion rests on its repeated assertion that the rapid dissipation of heroin in the blood risks the destruction of evidence. See, e.g., majority op. ¶¶ 40-45. Yet, the majority admonishes that this case "does not establish a per se rule that the dissipation of heroin in the blood always constitutes an exigency justifying a warrantless blood draw." Majority Op. ¶ 42.
¶ 73. Contrary to the above admonition, the author of the majority opinion got it right at oral argument. The State's argument, which the majority now adopts, is really "Bohling for heroin":
Justice Ziegler: Ok, but it has never been the law that just because evidence is really good, you don't need a warrant. That's almost what you are saying and you are losing me on that.
Counsel for the State: ... What I am saying is that because this really good evidence, this really probative evidence dissipates so quickly, at least in the case of heroin, and the public defender brought up some other drugs like marijuana and things like that, this is a whole different animal. I agree if this is a marijuana case, we would be done. We would be done because marijuana being a natural substance-cocaine being a natural substance-it doesn't break down. Heroin is a not natural substance — it's a synthetic and it does break down. That is why you need to get the evidence quickly. And that is why you have exigent circumstances because you need to get it quickly.
Justice Ziegler: So to be clear, you are basically asking us to revive Bohling in terms of heroin cases or substances that are not natural.
*40 . . . [W]hat I really hear you saying is that in heroin cases there is an exigency because it dissipates so quickly. That's Bohling for heroin, isn't it?
¶ 74. The majority now asserts that" [w]e instead resolve this case 'based on its own facts and circumstances.' " Majority op. ¶[ 42. Yet, all of the facts and circumstances the majority discusses relate only to dissipation: the type and amount of an ingested drug, the time it was ingested, the time it takes to get a warrant in relation to dissipation, and scientific evidence on the rapid dissipation of heroin. Id. Its best evidence rule places the focus on facts and circumstances relating only to dissipation. By inventing a best evidence rule for every heroin case and concluding that exigent circumstances exist because of the rapid dissipation of heroin, the majority creates a per se rule for heroin cases.
¶ 75. If the majority is correct that heroin is in the blood for only a few minutes and 6-monoacetyl-morphine is present in the blood for only one to three hours before metabolizing into morphine, this would be the circumstance in every case.[4] Even if the scientific evidence regarding the rate of dissipation changed, it would change for every case.
¶ 76. Likewise, the time it takes to obtain a warrant will always cause some delay in every case. In this case, Officer Fenhouse testified that that it takes approximately two hours to obtain a search warrant. Majority op. f 14. However, McNeely sounds a note of caution, explaining that consideration of the time it takes to obtain a warrant "might well diminish the *41 incentive for jurisdictions to pursue progressive approaches to warrant acquisition that preserve the protections afforded by the warrant while meeting the legitimate interests of law enforcement." McNeely, 133 S. Ct. at 1563 (citations omitted).
¶ 77. Underlying the majority's conclusion that the rate of dissipation of heroin in the blood justifies an exception to the warrant requirement is the majority's newly minted best evidence rule for heroin cases. According to the majority, "the officer could reasonably believe that waiting two hours to obtain a warrant would 'significantly undermin[e] the efficacy' of a blood draw by leading to ambiguous test results; evidence of heroin or morphine use, rather than heroin use alone, might result if sufficient time has passed." Majority op. ¶ 48.
¶ 78. The majority errs in its creation of a best evidence rule for heroin cases. It contradicts well-established law when it contends that a blood draw showing "heroin or its first metabolite, 6-monoacetyl-morphine, remained the most probative evidence that Parisi had used heroin."[5] Majority Op. ¶ 46. "Neither Wisconsin law nor federal law recognizes a 'best evidence rule' that established a hierarchy of evidence. In effect, all evidence is created equal." 7 Daniel D. *42 Blinka, Wisconsin Practice Series: Wisconsin Evidence § 1001.1 at 928 (3rd ed. 2008) (explaining the "myth of the best evidence rule").
¶ 79. Even if there were a best evidence rule, evidence of drugs in the bloodstream alone is not enough to support a possession charge. Here, Parisi was charged with possession of a schedule I or II narcotic drug. In Wisconsin, "the mere presence of drugs in a person's system is insufficient to prove that the drugs are knowingly possessed by the person or that the drugs are within the person's control." State v. Griffin, 220 Wis. 2d 371, 381, 584 N.W.2d 127 (1998). Evidence of drugs in the bloodstream is "circumstantial evidence of prior possession" and must be "combined with other corroborating evidence of sufficient probative value" in order to prove possession. Id.
¶ 80. The majority's reasoning is flawed because even if the police had been able to detect heroin or its first metabolite 6-monoacetylmorphine in the bloodstream, they still would need corroborating evidence to convict Parisi of heroin possession. In this case, police found " a bindle of what looked to be heroin wrapped in tinfoil, some cut ends, and [a] marijuana pipe" at the scene of the overdose. Majority op. ¶ 10. Additionally, Parisi was given Narcan before he was transported to the hospital, which Officer Fenhouse knew was "usually administered for people who have overdosed on heroin." Majority op. ¶ 7. Thus, the heroin found in the apartment where Parisi overdosed and the fact that he was treated with Narcan present key corroborating evidence.
¶ 81. The majority's reliance on McNeely for support of a best evidence rule is misplaced. The term "best evidence" does not appear in the McNeely major *43 ity opinion. Additionally, there are distinctions between the presence of alcohol in the bloodstream and the presence of heroin.
¶ 82. Evidence of heroin or 6-monoacetylmor-phine in the bloodstream is less probative than evidence of alcohol in the bloodstream because a BAC level alone is enough to obtain a drunk driving conviction. In contrast, evidence of drug use in the blood stream requires corroborating evidence for a possession conviction. Moreover, the amount of alcohol in the blood is relevant to a conviction, but the amount of heroin in the blood is not. Unlike a BAC level, the police need find only a trace of heroin or its metabolites in the bloodstream.
¶ 83. In State v. Jones the Nevada Supreme Court articulated this distinction. It determined that the dissipation of cocaine in the defendant's bloodstream was not an exigent circumstance that justified a departure from the normal procedure of obtaining a warrant. 895 P.2d 643, 644 (1995). The Jones court explained that evidence of alcohol and drugs in the blood differ. Id. That analysis is applicable here: "a conviction for driving under the influence requires a specific minimum concentration of blood alcohol, whereas a conviction for being under the influence of a controlled substance requires only a trace amount of the substance or its metabolites." Id.
¶ 84. The majority also misunderstands State v. Peardot, 119 Wis. 2d 400, 351 N.W.2d 172 (1984), when it cites to that case as support for the adoption of a best evidence rule. The term "best" was used merely as an adjective to describe the evidence. There is no discussion in Peardot supporting the adoption of a best evidence approach.
*44 ¶ 85. Finally, the majority's insistence that evidence of morphine in the bloodstream is less probative evidence than heroin or 6-monoacetylmorphine ignores the facts of this case. The warrantless blood draw performed on Parisi revealed evidence of morphine in his bloodstream, not heroin or 6-monoacetyl-morphine. It is this very evidence of morphine in Parisi's bloodstream that the State seeks to use and Parisi seeks to suppress.
1 — 1 b-i H-1
f 86. Not only did McNeely reject a per se rule based on dissipation, it also set forth circumstances in which the police must obtain a warrant without exception. 133 S. Ct. at 1561. McNeely instructs that "where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." Id.; see also Tullberg, 359 Wis. 2d 421, ¶ 42.
¶ 87. In a footnote, the majority rejects Parisi's arguments that a warrant should have been pursued because of the number of officers involved in the case. Majority op. ¶ 50 n.15. It advances that "Officer Fen-house could reasonably believe that asking another officer to obtain a warrant would be futile, given the short timeframe before evidence of heroin use disappeared." Id.
¶ 88. However, the McNeely court explained that in "a situation in which the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer . . . there would be *45 no plausible justification for an exception to the warrant requirement." Id. at 1561. That is exactly the circumstance here, yet the majority's decision directly contravenes McNeely.
¶ 89. Under McNeely, there is no plausible justification for the majority's decision. It is undisputed that there were a total of five to seven officers working on Parisi's case. See majority op. ¶ 9. Officer Fenhouse and Officer Moua both followed Parisi's ambulance to the hospital. Majority op. ¶ 11. Any of the five to seven officers working on the case could have applied for a warrant while Officer Fenhouse followed Parisi to the hospital.
¶ 90. In addition, there was no reason for delay in obtaining a warrant given that the officers had probable cause as soon as they arrived at the scene. As referenced above, Parisi was given Narcan before he was transported to the hospital, which Officer Fen-house knew was "usually administered for people who have overdosed on heroin." Majority op. f 7. The officers at the scene also found "a bindle of what looked to be heroin wrapped in tinfoil, some cut ends, and [a] marijuana pipe." Majority op. ¶ 10.
1 91. There is also no explanation for the delay in obtaining a warrant once Officer Fenhouse arrived at the hospital. Although Officer Fenhouse intended to have Parisi's blood drawn immediately, Parisi was initially deemed to be too unstable for the procedure. During the two hours that Officer Fenhouse waited at the hospital before Parisi's blood could be drawn, there was nothing that prevented him from obtaining a warrant.
¶ 92. After McNeely, this court has allowed only one exception to the warrant requirement for blood draws based on exigent circumstances. Tullberg, 359 *46 Wis. 2d 421, ¶ 30. The majority contends that Tullberg is an analogous case involving warrantless blood draws. Majority op. f ¶ 30, 40. It is not.
¶ 93. At the outset, the Tullberg court noted that the investigating officer "did not improperly delay in obtaining a warrant. He did not have probable cause to believe that Tullberg operated the motor vehicle while under the influence of an intoxicant until nearly three hours after the accident. If anything, Tullberg's actions, rather than the deputy's, necessitated the war-rantless blood draw." 359 Wis. 2d 421, f 44.
¶ 94. In contrast to the facts of this case, only one deputy was initially dispatched to the chaotic scene of the fatal collision in Tullberg. Id., ¶¶ 9-11. Additionally, Tullberg was not at the scene of the collision and the investigating deputy did not know he was the driver. Id., ¶¶ 8-10. When he was finally interviewed at the hospital, Tullberg told the deputy that he was a passenger in the vehicle. Id., ¶ 12. It was not until nearly three hours after the collision when the investigation uncovered evidence that helped identify Tull-berg as the driver responsible for the fatal collision. Id., ¶¶ 15-16.
¶ 95. Given the extraordinary facts and circumstances of that case, the Tullberg court explained that the deputy, when "confronted with such an accident scene and obstruction of his investigation, conducted himself reasonably." Id., ¶ 47. Under McNeely, and as it is applied in Tullberg, an exception to the warrant requirement for a blood draw is permissible only when circumstances prevent an officer from timely obtaining a warrant. McNeely, 133 S. Ct. at 1561; Tullberg, 359 Wis. 2d 421, ¶ 42. Here, however, the majority's analysis focuses only on facts and circumstances relating to dissipation because there *47 were no facts and circumstances preventing at least one of the five to seven officers from timely obtaining a warrant.
¶ 96. In its effort to excuse the multiple officers' inexplicable failure to obtain a warrant, the majority conflates dissipation in the bloodstream with cases involving the imminent destruction of physical evidence. See majority op. f 50 n.15. Relying on destruction of evidence cases, the majority asserts that "if officers suspect drugs are being flushed behind a closed door, [] the exigency is not eliminated merely because there are multiple officers at the scene." Id. (citing Kentucky v. King, 563 U.S. 452 (2001); United States v. Fiasche, 520 F.3d 694, 698 (7th Cir. 2008)). The majority then analogizes Officer Fenhouse's failure to obtain a warrant at the hospital to destruction of evidence cases where "split — second judgments-in circumstances that are tense, uncertain, and rapidly evolving." Id. (citing King, 563 U.S. at 466 (quoting Graham v. Connor, 490 U.S. 386, 396-97 (1989)).
¶ 97. Such reliance on destruction of evidence cases is unpersuasive, because " [t]he context of blood testing is different in critical respects from other destruction-of-evidence cases in which the police are truly confronted with a 'now or never' situation." McNeely, 133 S. Ct. at 1561 (citing Roaden v. Kentucky, 413 U.S. 496, 505 (1973)). Dissipation of a substance in the blood differs from circumstances "in which the suspect has control over easily disposable evidence." Id.
¶ 98. It is quite a stretch to compare the apparent availability of five to seven officers including a police officer sitting in a hospital waiting room for two hours, with a drug raid where officers hear evidence being flushed away. Likewise, the five to seven officers *48 at the scene of the overdose knew that Parisi was not about to imminently destroy evidence. The police certainly did not have to break through the door on a moment's notice because Parisi's friends met the officers outside to help direct them to the proper location. Majority op. ¶ 5. When the police entered the apartment, Parisi was laying unresponsive on the living room floor in his own vomit. Majority op. ¶ 6. Unlike making a split-second decision to preserve evidence, the steady dissipation of heroin in the blood is just not the kind of emergency that justifies foregoing a warrant.
¶ 99. I determine that under the facts and circumstances of this case, one of the five to seven officers could have secured a warrant in the two and one-half hours before Parisi's blood was drawn without significantly undermining the efficacy of the search. Officers were dispatched to the scene at 12:38 a.m. and arrived five to ten minutes after dispatch. Majority op. ¶ 4. Shortly thereafter, Narcan, the antidote for heroin, was administered. Majority op. ¶ 7. The blood draw did not occur until 3:10 a.m. Majority op. ¶ 13.
f 100. The State has the burden of proving the existence of exigent circumstances. State v. Richter, 2000 WI 58, ¶ 29, 235 Wis. 2d 524, 612 N.W.2d 29. It has utterly failed to do so here. Even if Officer Fen-house's failure to seek a warrant is excusable — and it is not — there is a complete dearth of information as to why none of the available five to seven officers failed to seek a warrant.
¶ 101. Contrary to the majority, I conclude that there were no exigent circumstances justifying an exception to the warrant requirement. As a result, the *49 warrantless blood draw violated Parisi's Fourth Amendment rights. Accordingly, I respectfully dissent.
¶ 102. I am authorized to state that Justice SHIRLEY S. ABRAHAMSON, J. joins this dissent.

 Parisi asserts a violation of both the Fourth Amendment to the U.S. Constitution and a violation of Article I, § 11 of the Wisconsin Constitution. When we refer to the Fourth Amendment in this discussion, we intend the discussion to be equally applicable to Article I, § 11 of the Wisconsin Constitution. "Generally, we have interpreted provisions of the Wisconsin Constitution consistent with the United States Supreme Court's interpretation of their counterparts in the federal constitution. However, on occasion, we have interpreted a provision in the Wisconsin Constitution more broadly than the *36 United States Supreme Court has interpreted a parallel provision in the United States Constitution." State v. Arias, 2008 WI 84, ¶ 19, 311 Wis. 2d 358, 752 N.W.2d 748 (citations omitted).

 The majority goes to such lengths to minimize the evi-dentiary value of morphine in the blood that it does not even bother to determine how long morphine is detectable after heroin use. According to the majority: "We do not possess, but do not require, information regarding precisely how long morphine remains in the human body after ingestion of heroin." Majority op. ¶ 44 n.14.
The majority is incorrect. At oral argument, Parisi's counsel explained that according to the Rook article supplied by the State, "the metabolites of heroin stay in the system for 12, could be even 24 hours ..."

 Bohling makes clear that it is specific to the drunk driving context. It stated that "a warrantless blood sample taken at the direction of a law enforcement officer is permissible under the following circumstances: (1) the blood draw is taken to obtain evidence of intoxication from a person lawfully arrested for a drunk-driving related violation or crime, (2) there is a clear indication that the blood draw will produce evidence of intoxication, (3) the method used to take the blood sample is a reasonable one and performed in a reasonable manner, and (4) the arrestee presents no reasonable objection to the blood draw." State v. Bohling, 173 Wis. 2d 529, 533-34, 494 N.W.2d 399 (1993) (emphasis added) abrogated by Missouri v. McNeely, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013).
The majority opinion fails to accurately state these requirements. It omits the first factor, which provides an essential distinction between Bohling and this case. See majority op. ¶ 31 & n.ll.

 The majority opinion dismisses the scientific articles Parisi submitted and instead relies on a solo article submitted by the State. See majority op. ¶ 43 n.13.

 The majority fails to adequately explain its singular focus of needing to find heroin — not morphine — in the blood. Parisi was charged with Possession of a Schedule I or II narcotic drug. Wis. Stat. § 961.41(3g)(am) provides that: "If a person possesses or attempts to possess a controlled substance included in schedule I or II which is a narcotic drug... the person is guilty of a Class I felony." Even if the police had only been able to convict Parisi of possession of morphine, both heroin and morphine carry the same criminal penalty. See Wis. Stat. §§ 961.14(3)(k) and 961.16(2)(a)10.